NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 18, 2025

S24A1184.  WASHINGTON v. THE STATE.

COLVIN, Justice.

Appellant Jamie Alexander Washington appeals his convictions for felony murder and related crimes in connection with the aggravated assault of Desmond Carter at a motel in Dougherty County and the shooting death of James Hawkins near the motel.[1]

---

[1] The crimes occurred on July 5, 2015. On October 1, 2015, a Dougherty County grand jury returned an indictment against Appellant, Mylan Mahoney, and Malcolm Bernard Offord, Jr. The co-defendants were reindicted on February 8, 2017, and Appellant was charged with conspiracy to commit armed robbery (Count 1), felony murder predicated on aggravated assault (Count 5), and aggravated assault of Hawkins and Carter (Counts 6 and 7, respectively). Before trial, Mahoney and Offord pled guilty pursuant to negotiated plea deals in exchange for their testimony against Appellant. Appellant was tried before a jury from February 17 through 21, 2020, and the jury found Appellant guilty as charged. The trial court sentenced Appellant to life in prison without the possibility of parole for felony murder (Count 5) and imposed concurrent ten-year and consecutive 20-year prison terms for conspiracy to commit armed robbery (Count 1) and aggravated assault (Count 7), respectively. The court merged for sentencing purposes the remaining aggravated-assault count (Count 6) with the felony-murder conviction (Count 5). Appellant timely filed a motion for new trial through new counsel on August 4, 2020, and amended

Appellant raises numerous claims of trial-court error and ineffective assistance of counsel. But as explained below, we conclude that his claims are unpersuasive and therefore affirm his convictions.

1. The trial evidence showed the following. Malcolm Bernard Offord, Jr. ("Offord") testified that, early in the morning on July 5, 2015, he drove Appellant and Mylan Mahoney to a motel. According to Offord and Mahoney, they were interested in getting some drugs, and the purpose of their motel visit was to meet with Offord's father, Malcolm Bernard Offord, Sr. ("Senior"), who admitted in his own trial testimony that he was a drug dealer at the time. According to Offord, when they arrived at the motel, Senior got into Offord's parked truck with the other men. Senior testified that he talked to Appellant about drugs, but when Appellant asked to buy a substantial amount of "crack cocaine," Senior "backed off."

Offord testified that "the conversation got switched from

---

the motion on February 28, 2022. Following a hearing, the trial court denied the motion for new trial on March 11, 2024. Appellant then timely filed a notice of appeal directed to this Court. The case was docketed to this Court's August 2024 term and submitted for a decision on the briefs.

buying drugs to robbing a drug dealer," and Mahoney confirmed that a conversation about committing a robbery occurred. Offord said that Appellant asked Senior about who was selling drugs, and, after Senior gave Appellant some information about different drug dealers, Appellant and Senior got out of the truck, looked at a motel room, and then returned to the vehicle. Offord testified that he, Appellant, and Mahoney then left the motel together and "chill[ed]" elsewhere for the day.

That night, according to Offord, Appellant brought up the idea of committing a robbery again, saying, "We could go on ahead and do it now," and, "We're going to do it now," to which Offord responded, "Okay." Offord testified that, before Offord drove Appellant and Mahoney back to the motel, they picked up some black bandanas from a store, Appellant and Mahoney changed into black clothing, and Appellant got a .357-caliber handgun from someone. Mahoney said that the pistol Appellant had was a "revolver." According to Offord, Offord gave Mahoney a .380-caliber pistol, which Offord confirmed was an "automatic" pistol that ejected

3

shell casings when fired, rather than a revolver, and which Mahoney described as a .380-caliber High Point. Offord said that he then dropped off Appellant and Mahoney in an alley behind a fast-food restaurant, which the record shows was near the motel.

Mahoney testified that they planned to rob someone at the motel, but "Carter got in the way of everything." Carter, who was renting a room at the motel on July 5, 2015, testified that two men, one of whom he identified in the courtroom as Appellant, were in the motel's breezeway that night. Mahoney, who testified that he was the other man Carter encountered, said that only Mahoney's face was masked at the time. And Carter testified that Appellant was not wearing a bandana or anything covering his face.

According to Carter, Appellant asked Carter for a cigarette lighter. And Mahoney similarly testified that Appellant asked Carter for a cigarette. But before Carter could give Appellant "a light," Carter said, he saw Appellant "grabbing for his pants[,] . . . like he was pulling a weapon out," and Carter saw "something chrome" that he recognized as a "revolver." Mahoney testified that

4

Appellant pulled out a revolver, and according to both Carter and Mahoney, Carter "took off running." Carter testified that the two men chased him, but he got away. And Mahoney testified that, while he and Appellant were chasing Carter, Carter "dropped something on the ground," and Appellant stopped to pick up what Carter had dropped. Then, according to Mahoney, Appellant and Mahoney left the motel.

The chase was witnessed by a motel patron, who testified that, after hearing some noise, she saw two men with masks chase Carter and then run in the opposite direction. And the chase was also captured by motel surveillance cameras. Specifically, the motel's surveillance video showed that a man, whom Carter identified as himself, ran alongside the motel and then across the parking lot. The video further showed that the man identified as Carter was being chased by two other men, whom Mahoney identified as himself and Appellant. And the video showed that the men identified as Appellant and Mahoney stopped their pursuit at the corner of the building, where the man identified as Appellant appeared to pick up

5

something from the ground before both men ran in the opposite direction.

Mahoney testified that, following the chase, he and Appellant "ran through the alley" near the motel to get back to Offord's vehicle. Mahoney said that, while wearing a mask and having his gun out, he ran "full speed" around a corner from the alley onto the sidewalk, and he encountered Hawkins standing there by a bus stop. According to Mahoney, Hawkins "confronted" Mahoney, tackling him to the ground. Mahoney testified that he and Hawkins "wrestled around" on the ground, but Mahoney eventually managed to get free of Hawkins and stand up. According to Mahoney, after Mahoney got to his feet, Appellant "shot [Hawkins]."

Two cousins, who happened to be driving by at the time, testified that they witnessed the shooting. One cousin testified that three men came out of an alley, that he heard "two or three" gunshots and saw the associated "fire go off," and that two of the men then ran away from the scene. He further testified that he called 911 and told dispatch that a man had been shot and was lying

6

face down on the ground. Similarly, the other cousin testified that he saw two men walking behind a third man, that one of the two men shot the third man, who fell to the ground, and that the two men then "took off running."[2]

Offord said that he heard the gunshots, and Mahoney testified that, following the shooting, he and Appellant ran back to Offord's vehicle. According to Offord and Mahoney, Appellant and Mahoney got into Offord's truck, and Offord drove them away from the scene. Offord testified that, as they drove, everyone was "quiet" and there was a "tens[e]" atmosphere in the truck. According to Offord, after the shooting, he retrieved his gun from Mahoney, dropped off Appellant and Mahoney, "got rid of [his] gun," and then "report[ed] [his] gun stolen" to avoid blame for "anything that had occurred over there."

Officers who responded to the scene of the shooting found Hawkins lying dead on the ground. Although Hawkins had multiple

---

[2] Because it was dark, neither cousin could identify the men involved in the shooting.

gunshot wounds, officers did not find any shell casings. And a crime scene investigator with firearms training testified that, in contrast with an "automatic" pistol that "automatically eject[s]" a shell casing when fired, a "shell casing stays inside" a "revolver" when fired and must be "manually take[n] . . . out" of the gun.

Offord said that, sometime during the night of the shooting, Offord returned to the crime scene to check on his father, Senior, who had told Offord over the phone that someone had been shot. Offord testified that Senior was concerned that the victim might be Hawkins, who, as it turned out, was a member of their extended family. According to Senior, Offord told Senior that Offord had something to do with the shooting, saying that he was "sorry," that he had brought the men he had been with that morning back to the motel, and that "[t]hey did that." Senior testified that he told Offord, "Man, turn yourself in." And when Offord failed to do so, Senior testified, he contacted the police to report Offord's involvement in the crime. According to Senior, he called Offord and allowed police officers to listen to their conversation. When asked if "anyone

identif[ied] [Appellant] at that point to the police," Senior responded, "[Offord] did."

The medical examiner who later performed Hawkins's autopsy testified that Hawkins was shot three times in his left side from a distance of at least two-and-a-half feet away, resulting in injuries to his chest, hip, and knee that were fatal, potentially fatal, and nonfatal, respectively. According to the medical examiner, Hawkins also had blunt force injuries to his right side that were consistent with "a fall-type injury."

Appellant, who took the stand in his own defense, denied meeting with Senior on the morning of the shooting, participating in any conspiracy with Offord or Mahony, planning to rob drug dealers, being present at the motel on the night of the shooting, being present for the shooting itself, or knowing anything about the shooting. Appellant testified that, on the night of the shooting, he was in another neighborhood that he frequented. According to Appellant, that night he "smok[ed] weed" and "kick[ed] it" with some "guys" and "might" have also gone to the house of "[a] girl name[d] Tree," with

9

whom he had a sexual relationship, and either "kick[ed] it [there] for the rest of the night" or "ha[d] sex with her" and then "peel[ed] out [to] go to another homie['s] house" to "kick it."

Appellant claimed that Offord and Mahoney were lying about him because they were angry that he had beaten them up. Appellant explained that he, Offord, and Mahoney were members of "a Blood gang" called the "Georgia Denver Lanes," and that Appellant was the "enforcer" of the gang tasked with punishing gang members for violations of gang protocol. Appellant described himself as "a fighter" who trained to box, "like[d] to fight," and was known as "Jaw Jacker" because "Jaw" is an acronym for his first, middle, and last name, and because he "fight[s] very well." He further said that "a lot" of his fights had been "videotaped" and that he was "well-known" in the community "because one of [his] videos went viral and had over a million views." According to Appellant, he beat up Offord and Mahoney two days before Hawkins's shooting because Offord and Mahoney had violated gang protocol when they committed a "drive-by" shooting and used a "registered gun" that "leaves a trail."

Appellant said that Offord and Mahoney got "extremely mad" when Appellant told them they needed to be punished for violations, and that Offord and Mahoney "very much" felt like Appellant had stepped out of line by beating them up.

2. Appellant argues that the trial court erred in denying his motion for a directed verdict as to the felony-murder charge because the trial evidence was insufficient under Georgia's accomplice-corroboration statute, which provides that, in "felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient." OCGA § 24-14-8. Specifically, Appellant argues that the only evidence that Appellant shot Hawkins came from Mahoney, who was an accomplice to the crime. And although Appellant concedes that both Mahoney and Offord testified that Mahoney and Appellant were present and armed when the shooting occurred, he argues that no evidence showed "which handgun fired the fatal rounds." This claim fails.

"The standard of review for the denial of a motion for a directed verdict of acquittal is the same as for determining the sufficiency of

11

the evidence to support a conviction." *Clements v. State*, 317 Ga. 772, 783 (1) (896 SE2d 549) (2023) (citation and punctuation omitted). In assessing the sufficiency of the evidence,

> we view all of the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted.

Id. at 789 (4) (citation and punctuation omitted). It is well established that, "in order to sustain a [felony] conviction under Georgia law, testimony by an accomplice to a crime must be corroborated by other evidence implicating the defendant." *Nicholson v. State*, 307 Ga. 466, 471 (2) (837 SE2d 362) (2019) (citing OCGA § 24-14-8). "[T]he testimony of one accomplice," however, "can be corroborated by the testimony of another accomplice." Id. (citation and punctuation omitted). And "corroborating evidence may be slight," "may be entirely circumstantial," and "need not be sufficient in and of itself to warrant a conviction, so long as it is independent of the accomplice's testimony and directly connects the defendant to the crime or leads to the inference of guilt." *McGarity v. State*, 308

Ga. 417, 420 (841 SE2d 718) (2020) (citation and punctuation omitted). "Once the State has introduced independent evidence implicating the defendant, it is for the jury to decide whether the accomplice's testimony has been sufficiently corroborated." Id. (citation and punctuation omitted).

Contrary to Appellant's argument, he was not convicted of felony murder based solely on the uncorroborated testimony of Mahoney. Offord and Mahoney both testified that, on the morning of the shooting, they were present with Appellant for a conversation about committing an armed robbery at the motel. Mahoney testified that the men went back to the motel that evening planning to commit a robbery there. And Offord corroborated that testimony, saying that, in the evening, Appellant expressed a desire to commit the robbery "now," after which Offord drove Appellant and Mahoney to the motel. Further, both Mahoney and Carter identified Appellant as the man who, along with Mahoney, attempted to rob Carter shortly before Hawkins's shooting. Mahoney's testimony that he and Appellant ran down an alley near the motel after attempting to rob

13

Carter was corroborated by the motel patron who saw two men chase Carter and then run in the opposite direction, and by video surveillance footage from the motel showing that, after Carter got away, the two men chasing him turned around and ran in the direction of the alley that led to the location where Hawkins was ultimately shot. And Mahoney's testimony that he encountered Hawkins at the end of the alley, that Appellant shot Hawkins, and that Mahoney and Appellant then ran back to Offord's vehicle was corroborated by the two cousins who witnessed two men run away after shooting the victim and by Offord's testimony that, following the gunshots, Appellant and Mahoney got into Offord's truck.

Although Appellant contends that the trial evidence was insufficient to convict him of felony murder because no evidence corroborated Mahoney's testimony that Appellant personally shot Hawkins, proof that Appellant, rather than Mahoney, shot Hawkins was not essential to establish Appellant's guilt as a party to Hawkins's murder. See *Henderson v. State*, 317 Ga. 66, 72-73 (2) (891 SE2d 884) (2023) (noting that the jury could have found the

defendant guilty of murder as a party to the crime "even if [the defendant] was merely the driver and did not personally shoot either victim"). In any event, the record belies Appellant's argument that no trial evidence corroborated Mahoney's testimony that Appellant was the shooter. Specifically, when asked, Offord agreed that Mahoney was armed with an "automatic" pistol that ejected shell casings when fired, Carter testified that Appellant was armed with a "revolver," and a crime scene investigator with firearms training testified that a difference between "automatic" pistols and "revolver[s]" was that only the former type of firearm would automatically eject shell casings when fired. Because no shell casings were found at the scene, where Hawkins suffered multiple gunshot wounds, the jury would have been authorized to find that the person carrying the revolver (Appellant), rather than the person carrying an "automatic" pistol (Mahoney), shot Hawkins. And that evidence therefore corroborated Mahoney's testimony that Appellant was the shooter.

Accordingly, we conclude that the trial evidence was sufficient

15

under Georgia's accomplice-corroboration statute to support Appellant's conviction for felony murder.

3. Appellant argues that, during an exchange with Carter, the trial court violated OCGA § 17-8-57 (a) (1), which prohibits a judge presiding over a criminal case from "express[ing] or intimat[ing] to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused." We disagree.

By way of background, following the robbery incident, a detective presented Carter with a photo lineup that included Appellant's photo, and Carter identified Appellant's photo, noting that Appellant's nickname was "Jaw Jacker." At trial, Carter was unclear about what role statements from people in his community, as opposed to his own memory, played in his identification of Appellant and Appellant's nickname during the photo lineup. Carter testified that Appellant's name did not come up immediately in his interview with the detectives because "it wasn't clear to [him] until after," and Appellant's "face didn't too much hit [him] until [he] started realizing who [Appellant] was and people [in the community]

16

went to talking," after which he knew "[t]hat's who that was." Seeking clarification about Carter's testimony, the court asked, "Now, did you have the benefit of th[ese] people in the community talking before . . . or after . . . you went downtown and spoke with officers?" Carter responded that "the people went to talk afterwards." The court then asked, "I guess the question is[,] did whatever you heard in the community . . . play any role in your determination of the person?" And Carter responded, "Yes, ma'am."

Shortly after this exchange, the court said to counsel, "I was just trying to get an understanding. It seemed unclear as to what he was saying. And I wanted to make sure that it was clear. That I understood it." But a discussion between the court and defense counsel about what Carter was "stating" led defense counsel to conclude that matters were still "very unclear," so the court directed further questions to Carter. And as specifically relevant on appeal, the following exchange occurred:

> The Court: But now, this is key now. *I want to make sure that this is the truth.* That when did – when this incident happened with you and when you went downtown to

speak with law enforcement, I heard you say that – or you testified that there was some talk in the community about this incident.

Mr. Carter: Yes, ma'am.

The Court: My question is[,] did the talk in the community play a role in your identification of the people [sic] [i]n this photograph?

Mr. Carter: I still can't get this down.

The Court: You don't understand what I'm asking?

Mr. Carter: Yes, ma'am.

The Court: All right. So what I'm trying to say, did you rely on what the people said in the community to make the identification, or did you rely on your own senses to make the identification?

Mr. Carter: I relied on the people in the community.

. . .

The Court: You only made the identity of the person in the photograph based on what people in the community said?

Mr. Carter: Right. That's what brought my memory of who this guy – who he was.

The Court: I guess I[ ] confused you. Are you saying a name versus who you saw on that evening? Well, let me just ask it like this, because I want to make sure. And it's not my job to do that, but I was confused. . . .

(Emphasis supplied.) At this point, defense counsel objected that the question had been "asked and answered," and the court responded:

Well, I want to make sure that it's clear. . . . I interposed a question, because I was confused about what he said. And if I was confused, I presupposed that the jury was likewise confused. And so I asked questions only for purposes of clarity.

18

The court did not ask any further questions of Carter, and on redirect examination, Carter testified that he had identified Appellant in the photo lineup based on his memory. But he also expressed that he was "kind of confused" about when he heard talk in the community in relation to when he identified Appellant in the photo lineup. And he gave conflicting testimony about whether he knew Appellant's nickname, "Jaw Jacker," when he made the photo identification.

Appellant argues on appeal that the trial court violated OCGA § 17-8-57 (a) (1) by telling Carter that "I want to make sure that this is the truth." According to Appellant, this statement improperly expressed an opinion that a fact at issue in the case had been proved, namely, that community discussions did not play a role in Carter's identification of Appellant. And as a result, Appellant argues, the comment also implied that Appellant was guilty.

Because Appellant did not object at trial that the court's statement violated OCGA § 17-8-57 (a) (1), we review this claim "only for plain error." *Thompson v. State*, 304 Ga. 146, 155-156 (11)

(816 SE2d 646) (2018). See also OCGA § 17-8-57 (b) (providing that an unpreserved argument that a statement violated OCGA § 17-8-57 (a) (1) is reviewed for plain error on appeal). To establish plain error under OCGA § 17-8-57, an appellant

> must point to a legal error that was not affirmatively waived, was clear and obvious beyond reasonable dispute, affected his substantial rights, and seriously affected the fairness, integrity, or public reputation of judicial proceedings.

*Tedder v. State*, 320 Ga. 29, 38 (3) (a) (907 SE2d 623) (2024) (citation and punctuation omitted).

Here, Appellant has not shown any error, much less plain error. Carter's testimony was confusing, and the judge's statement that she "want[ed] to make sure that this is the truth" expressed only a desire to clarify what Carter was trying to convey to the jury. Further, the judge's line of questioning focused narrowly on trying to clarify a specific aspect of what Carter was saying — whether he was saying he identified Appellant in the photo lineup and gave the detective Appellant's nickname based on his personal recollection of the incident or based on comments made by people in Carter's

20

community. See *Sturkey v. State*, 319 Ga. 156, 158-159 (2) (902 SE2d 607 (2024) ("Beyond the narrow prohibition contained in OCGA § 17-8-57 (a), it is well settled that a trial judge has discretion to propound questions to a witness to develop the truth of the case or to clarify testimony," and "[t]he extent of such examination likewise is a matter of the judge's discretion." (citation and punctuation omitted)). The judge did not "indicate, either impliedly or expressly," that Carter was telling the truth, that the judge had an opinion about which of Carter's seemingly inconsistent statements were the truth, or that "the judge viewed [Carter's testimony] as conclusive evidence of [Appellant's] guilt." Id. at 159 (2) (holding that a judge's statements and questions "focused narrowly" on obtaining clarity about a witness's methodology did not express an opinion about the evidence or the defendant's guilt). Accordingly, this claim fails.

4. Appellant argues that the trial court abused its discretion in permitting the State to ask Appellant questions about his criminal history during cross-examination. We conclude, however, that any error was harmless.

At trial, Appellant volunteered on direct examination that he, Offord, and Mahoney were gang members, that, as the enforcer of the gang, Appellant beat up other gang members for violations of gang protocol, and that he had beat up Offord and Mahoney for gang-protocol violations two days prior to Hawkins's shooting. On cross-examination, Appellant testified that he had authority to discipline gang members in the Albany area, but that he was not always in Albany and sometimes went to Atlanta. When asked about what he did in Atlanta, Appellant explained that he went to Atlanta to "be with [his] family" because, while he "was incarcerated [for] 10 months," his family had "relocated from Albany to Atlanta." The prosecutor then asked why Appellant had been incarcerated for ten months, and Appellant said that he had "[m]isdemeanor charges."

Later in cross-examination, the prosecutor asked Appellant for his explanation for why Carter had identified him, and Appellant responded that the community knew him due to a viral video of him fighting. The prosecutor followed up by asking if Appellant's "argument" was that Carter had identified him because Carter had

seen Appellant on social media. In response, Appellant said that he had "been locked up a lot of times for misdemeanors" and "locked up [for] a couple of felonies" and that "interrogation . . . can be hell." Following this response, defense counsel lodged an unspecified objection to the prosecutor's question, which the court sustained.[3]

Following the court's ruling, the prosecutor asked the court for permission to ask Appellant "about his misdemeanors and felonies, because he's opened the door to that" with "his non-responsive answer." Defense counsel objected on relevancy grounds, but the court overruled the objection. The prosecutor then asked which prior misdemeanors and felonies Appellant had, and Appellant responded that he could not recall the misdemeanors, that he had "caught" charges in 2010 for "burglary," "aggravated assault," and "hijacking," and that only the aggravated assault was "on [his] record]" because the other charges were "dropped." Appellant claimed that the State kept "put[ting]" charges on him when he was

---

[3] In its preliminary instructions, the court instructed the jury that, if it sustained an objection to evidence, the jury should disregard that evidence.

23

in jail. The prosecutor then inquired about what weapon the State charged him with using in connection with the aggravated assault, and Appellant responded that he was not charged with using a weapon, and that he pled guilty to the charge because it was pending for seven years, "hinder[ing] [him] from getting jobs," and he wanted to resolve the case. When asked if the "hijacking" charge involved guns and stealing cars, and Appellant confirmed that "[t]hat's what the detective said." Following this testimony, the prosecutor asked if Appellant's "testimony today [was] that [he] ha[d] been plagued by people lying about [him] and [that was what was] happening in this case as well," and Appellant responded, "Yes."

Assuming without deciding that this claim of error is preserved for ordinary appellate review, any evidentiary error in permitting the State to ask questions of Appellant about his criminal history was harmless. See *Smith v. State*, 313 Ga. 584, 587-588 (872 SE2d 262) (2022) (noting that, where an alleged evidentiary error was harmless under the standard for reviewing preserved non-constitutional errors, which "is more favorable" to an appellant than

24

the test for assessing prejudice under the plain-error standard, we need not determine whether challenges to each piece of testimony were preserved "before assessing the aggregate harm of the testimony that we have assumed to be inadmissible"). "A nonconstitutional error is harmless if the State shows that it is highly probable that the error did not contribute to the verdict, an inquiry that involves consideration of the other evidence heard by the jury." Id. at 587 (citation and punctuation omitted).

Here, throughout his testimony, Appellant described himself as a person with a violent character who committed violent acts. Specifically, he said that he was a gang member and "a fighter," who trained to fight, "like[d] to fight," beat up fellow gang members in his role as the gang's "enforcer," earned a nickname based in part on the fact that he "fight[s] very well," and had a reputation in the community based on a video recording of one of his fights that went "viral." And Appellant further volunteered information about his criminal history without being prompted to do so, testifying that he had previously been "incarcerated [for] 10 months" for

"[m]isdemeanor charges." Appellant argues that his answers to the prosecutor's questions about his criminal history — which informed the jury that he had previously been charged with several crimes but had only been convicted of aggravated assault — reflected badly on his general character. But given Appellant's repeated descriptions of himself as a violent person, it is highly probable that this additional information about Appellant's criminal history did not contribute to the verdict. Cf. *Hancock v. State*, 277 Ga. 835, 839 (5) (596 SE2d 127) (2004) (holding that testimony from the State's expert witness about "prior incidents of violence reportedly committed by [the] appellant" was harmless "in light of the extensive testimony by defense experts discussing [the] appellant's past violent acts").

5. On appeal, Appellant contends that his trial counsel was constitutionally ineffective in multiple respects. To prevail on an ineffective-assistance-of-counsel claim, a defendant must show deficient performance and prejudice. See *Monroe v. State*, 315 Ga. 767, 781 (6) (884 SE2d 906) (2023) (citing *Strickland v. Washington*,

26

466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). Establishing deficient performance requires a defendant to "demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Pierce v. State*, 319 Ga. 846, 865 (11) (907 SE2d 281) (2024) (citation and punctuation omitted). "There is a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." Id. (citation and punctuation omitted). "Overcoming that presumption requires an appellant to show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." Id. (citation and punctuation omitted). To establish prejudice, "a defendant must show that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Zayas v. State*, 319 Ga. 402, 409 (3) (902 SE2d 583) (2024) (citation and punctuation omitted). If the defendant fails to establish either deficient performance or prejudice, this Court need not examine the other requirement. See

*Pierce*, 319 Ga. at 865 (11).

(a) Appellant argues that trial counsel was ineffective for failing to interview and obtain trial testimony from Ramona Hodge, who testified at the motion-for-new-trial hearing that she was in the general vicinity of the shooting, that she saw two men running, and that, although she was unable to provide a good description of the men "because it was dark" and she "could only see their silhouette," one of the men had "medium length hair" that "seemed like it had dreads." According to Appellant, this testimony was important because it was undisputed at trial that Appellant did not have dreadlocks.

This claim fails because Appellant has not shown deficient performance. At the motion-for-new-trial hearing, Hodge testified that she had moved to another state in 2018 (two years before Appellant's trial), and that she had not provided updated contact information to the police when she did so. Trial counsel testified that, before trial, he attempted to track down Hodge, visiting two residences associated with Hodge and using Lexis Nexis, People

28

Finder, and "another program," but that he was unable to find her. And Appellant's mother corroborated trial counsel's testimony, testifying that Appellant's trial counsel told her before trial that he had visited two addresses looking for Hodge, but that he was unable to get in contact with her. Because trial counsel made reasonable efforts to locate Hodge but was unable to do so, counsel was not deficient. See *Moore v. State*, 278 Ga. 397, 400 (2) (d) (603 SE2d 228) (2004) ("Trial counsel cannot be held ineffective for failing to track down a witness whose whereabouts are unknown." (citation and punctuation omitted)).

(b) Appellant contends that trial counsel was ineffective for failing to raise a hearsay objection when Detective Jameel Gulley, who investigated the crimes, testified about what Senior and Carter had told him, and when Senior testified about statements made by Offord. We conclude, however, that trial counsel's failure to object was not deficient performance.

During Detective Gulley's trial testimony, the prosecutor asked him what Senior had told him, and Detective Gulley responded,

29

"Well, he basically just said his son had something to do with it." Later, the prosecutor asked Detective Gulley whether Carter gave the detective "any details about [the robbery] incident." The detective responded that Carter said "James Hawkins[ ] had been telling people to look out" because there were "two guys out [t]here posted up with masks over their face," and that Carter did not "think that was strange . . . [b]ecause all kind[s] of people [were] out [t]here doing whatever." Detective Gulley then recounted Carter's story about being approached by two men, asked for a cigarette, and running away when one of the men pulled a gun out. Further, when Senior was on the stand, the prosecutor asked him what he had talked to an officer about, and Senior responded, "So I told him, my son say that he brought them guys back over here, you know, without me knowing." Trial counsel did not object on hearsay grounds to any of this testimony.

Here, Appellant has not shown that trial counsel was deficient for failing to raise hearsay objections to the above testimony because the hearsay testimony "was cumulative of earlier unchallenged

30

testimony." *Pierce*, 319 Ga. at 867 (11) (b). Specifically, when Detective Gulley testified that Senior told him Offord had something to do with the shooting, Offord had already testified about his own involvement in the shooting. The relevant aspects of Detective Gulley's description of Carter's police statement simply recounted details from Carter's prior testimony about how the robbery unfolded. And Senior testified that Offord told him Offord had brought the guys back to the motel only after both Offord and Mahoney had taken the stand and testified that Offord had driven Appellant and Mahoney back to the motel on the night of the shooting. Accordingly, this claim fails.

(c) Although Appellant contends that trial counsel was deficient for failing to request an alibi instruction, we disagree that counsel's performance was deficient. As noted above Appellant testified at trial that, on the night of the shooting, he was in another neighborhood that he frequented, where he "smok[ed] weed" and "kick[ed] it" with some "guys" and "might" have also gone to the house of "[a] girl name[d] Tree" for part or all of the night. At the

31

motion-for-new-trial hearing, trial counsel did not provide a strategic reason for why he failed to request an alibi instruction after Appellant, who had initially chosen not to testify, changed his mind, took the stand, and testified about a woman named "Tree." But trial counsel testified that, when preparing for trial, he had considered presenting an alibi defense and decided against doing so because he had "no . . . identifying information other than a nickname,"

While Appellant's trial testimony provided slight evidence supporting an alibi charge, failure to pursue an alibi defense was not "objectively unreasonable" trial strategy. *Pierce*, 319 Ga. at 865 (11) (citation and punctuation omitted). Appellant's testimony — that, when the crimes occurred, he was in another neighborhood where he spent time with some unidentified men and "might" have also spent time with a woman identified only by a nickname — was self-serving, vague, and equivocal. There was no evidence substantiating his testimony. And as outlined above, the State introduced substantial evidence detailing Appellant's participation in the crimes. As a result — and as trial counsel correctly predicted

when preparing for trial — it would have been difficult for trial counsel to credibly argue to the jury that Appellant could not have committed the crimes because he was with someone else in another neighborhood when the crimes occurred. Because an alibi defense would have been weak, we cannot say that "no reasonable lawyer" would have forgone an alibi defense. Id. (citation and punctuation omitted). See *Moore*, 278 Ga. at 400 (2) (c) (holding that "failure to request a jury charge on alibi" was not deficient performance where "the only evidence of alibi was a statement attributed to [the defendant]" that trial counsel did not view as "sufficient to support an alibi defense"); *Harris v. State*, 280 Ga. 372, 375 (3) (627 SE2d 562) (2006) (no deficient performance in failing to present an alibi defense where counsel did not believe there was credible alibi evidence). Accordingly, this claim fails.

(d) Appellant argues that trial counsel was deficient for failing to object when, in response to Appellant's testimony about possibly being with a girl named "Tree" at the time of the shooting, the prosecutor asked Appellant if "Tree [was] in the courtroom" and

33

"[w]here is she at?" According to Appellant, these questions were objectionable because they impermissibly shifted the burden to Appellant to produce evidence to disprove his guilt.

Assuming without deciding that trial counsel's failure to object to these questions constituted deficient performance, we conclude that Appellant has not shown prejudice. At worst, the prosecutor's questions shifted the burden to Appellant to prove a defense of alibi that, as discussed above, had no reasonable chance of success and was not pursued by defense counsel at trial. And the trial court mitigated any potential harm from the prosecutor's questions by properly instructing the jury on the burden of proof. See *Davis v. State*, 294 Ga. 486, 488 (3) (b) (754 SE2d 67) (2014) ("Qualified jurors under oath are presumed to follow the instructions of the trial court." (citation and punctuation omitted)). Further, the trial evidence — which included not only detailed testimony about Appellant's participation in the crimes from two coconspirators, but also testimony from several eyewitnesses to the crimes, surveillance footage, and damaging testimony from Appellant himself — strongly

34

supported the jury's guilty verdicts. Accordingly, Appellant has not shown "a reasonable probability" that, but for counsel's failure to object to the prosecutor's two questions about the purported alibi's whereabouts, "the result of the trial would have been different." *Zayas*, 319 Ga. at 409 (3) (citation and punctuation omitted).

(e) Appellant argues that trial counsel was deficient for failing to object when the medical examiner, who was not a ballistics expert, testified about the size of bullets recovered from Hawkins's body. We disagree.

At trial, the medical examiner testified that she recovered three "deformed" bullets from Hawkins's body, two of which were "jacketed" and the third of which was "just a core." When asked how she would describe the bullets, the medical examiner responded that she was "not a ballistic[s] expert," but that she categorized bullets as "small, medium, [or] large" in size. She further testified that the jacketed bullets were "medium caliber projectiles . . . , which could range from .32 to .38, 9 mil, somewhere in that range," and that the core she recovered "was consistent with being the same as the

35

[other] ones . . . , but [she] couldn't say 100 percent." In addition, the medical examiner testified about the trajectory of the bullets, saying that they traveled "slightly back to front," "coming in . . . more towards the back and . . . ending up more towards the front." And she testified about the distance from which Hawkins was shot, saying that, based on the absence of "soot," "searing," and "stippling," he was shot from at least two-and-a-half feet away.

Appellant has not shown deficient performance on this basis. Although the medical examiner said that she was not a ballistics expert, she demonstrated that she had experience dealing with certain ballistics issues, including range of fire, bullet trajectories through the body, and rough classifications of bullet size. And she was careful not to exceed the bounds of her expertise, saying only that the bullets appeared to fall within the medium size range without specifically identifying the calibers of the bullets she recovered. Thus, a reasonable attorney could have concluded that the medical examiner's careful and limited testimony about the size of the bullets fell within the scope of her expertise, and therefore

that an objection to her testimony would not have succeeded. See *Johnson v. State*, 296 Ga. 504, 506 (2) (769 SE2d 87) (2015) (medical examiner's opinion testimony about "why the autopsy did not reveal any bullet fragments in the wound" did not go beyond her expertise because she "demonstrated that she was experienced in dealing with certain ballistics issues related to, among other things, range of fire, soot, stippling, and the trajectory of a bullet through a body"). And as a result, Appellant has not shown that "no reasonable lawyer" would have forgone an objection to the medical examiner's testimony. See *Pierce*, 319 Ga. at 865 (11) (citation and punctuation omitted).

(f) Appellant next argues that trial counsel was ineffective for failing to object to certain statements made by the prosecutor during closing arguments, which Appellant argues shifted the burden of proof, mischaracterized the proof-beyond-a-reasonable-doubt standard, and improperly advised the jury about which witnesses the prosecutor found credible. As explained below, these claims fail.

*i.* As relevant to Appellant's contention that the

37

prosecutor shifted the burden of proof and mischaracterized the burden of proof, the prosecutor began his closing argument by explaining that the State had "the burden of proof," whereas a defendant "doesn't have a burden" and does not "have to prove anything." The prosecutor continued:

> Now, that's important, because essentially, that means that *the [d]efense can say whatever they want to, because they don't have to prove anything. They can throw anything they want at you, make any kind of bogus assertions and things like that, and they don't actually have to prove that*, which is kind of nice. And, you know, I'm kind of jealous sometimes that they don't have to prove what they say. But, you know, that's the way the system works.

(Emphasis supplied.) The prosecutor then stated that "what the [d]efense argues and what they give you in the closing argument isn't actually evidence, . . . it's just argument," so the jurors had to "listen to the evidence" and apply their "common sense." And the prosecutor further told the jury,

> *[W]hen we tell you . . . that we have to prove this beyond a reasonable doubt, what that really means is do you believe it or not; right? Because if you have reasonable doubt, you don't believe it.* Does that make sense? . . . Reasonable doubt is your common sense saying, I believe this

happened. . . . [A]nd you don't want to look for doubt. If you're sitting there saying, "Well, I think he did it, but I don't think they proved it enough[,]" . . . that's looking for doubt. *Because if you think someone did something, you don't have reasonable doubt. If you have reasonable doubt, you don't think somebody did something. It's that simple.*

(Emphasis supplied.)

Then, in rebuttal closing, the prosecutor addressed the burden of proof again, saying:

Now, the Judge is going to tell you what reasonable doubt is. . . . Again, it's a doubt for which you can give a real reason based on evidence or lack of evidence. It's the doubt of an honest impartial juror seeking the truth. It is a doubt which should be based on common sense and a reason.

At the conclusion of the case, the trial court instructed the jury on the presumption of innocence, the burden of proof, reasonable doubt, and grave suspicion. The court also charged the jury that it was the court's duty to determine the law, that the jury was bound by the court's instructions, and that attorney arguments were not evidence.

On appeal, Appellant contends that trial counsel was deficient for failing to object to the prosecutor's statement that the "[d]efense

can say whatever they want to, because they don't have to prove anything." According to Appellant, this comment shifted the burden to Appellant to prove his innocence. We conclude, however, that the comment did no such thing, as the prosecutor specifically told the jury that the defendants "don't have to prove anything," not that the defendant had to prove his innocence. Moreover, reading the comment in context, it is clear that the prosecutor was saying that Appellant did not have to prove his innocence because the prosecutor made comments shortly before and after this comment that emphasized the same point. Specifically, the prosecutor told the jury that the State had "the burden of proof," that the defendant "doesn't have a burden," that the defendant does not "have to prove anything," and that, although the burden being on the State disadvantaged the State, that was just "the way the system works." "[T]rial counsel's failure to make a meritless objection" was not deficient performance. *Gaston v. State*, 307 Ga. 634, 640 (2) (b) (837 SE2d 808) (2020) (citation and punctuation omitted).

Appellant also argues that trial counsel should have objected

when the prosecution mischaracterized the burden of proof, equating proof beyond a reasonable doubt with a "belief" that Appellant committed the crimes. We agree that the State improperly equated proof beyond a reasonable doubt with mere belief in this one instance by stating that the standard was whether jurors "believe[d]" or "th[ought] someone did something." See, e.g., *Ward v. State*, 271 Ga. 62, 64 (2) (515 SE2d 392) (1999) (the trial court improperly lowered the standard of proof by stating that proof beyond a reasonable doubt was equivalent to an "honest belief" in the defendant's guilt). But even assuming that trial counsel provided constitutionally ineffective assistance in failing to object to the State brief mischaracterization of the proof-beyond-a-reasonable-doubt standard, we conclude that Appellant has not shown prejudice. Although the prosecutor's remark misstated the law, the prosecutor later gave a correct description of reasonable doubt that mirrored the pattern jury charge. And the court also charged the jury on the burden of proof, the court's duty to instruct the jury on the law, the jury's duty to follow the court's instructions,

41

and the fact that closing arguments were not evidence. Moreover, as discussed above, the evidence of Appellant's guilt was strong. See, e.g., *Jackson v. State*, 319 Ga. 51, 54-55 (2) (901 SE2d 552) (2024) (no prejudice from the prosecutor's statement that the jurors could find the defendant guilty beyond a reasonable doubt if they "believed" the defendant was guilty in their "hearts" and "minds" because there was "significant proof" of the defendant's guilt, the prosecutor "accurately explained" the burden of proof elsewhere in closing arguments, and the trial court later corrected the prosecutor's mischaracterization by properly instructing the jury on the burden of proof and clarifying that the jury was bound by the court's instructions on the law and that closing arguments were not evidence (punctuation omitted)). Accordingly, Appellant has not shown "a reasonable probability" that, but for trial counsel's failure to object to the prosecutor's brief-but-erroneous description of the law on reasonable doubt, "the result of the trial would have been different." *Zayas*, 319 Ga. at 409 (3) (citation and punctuation omitted).

42

*ii.* Appellant argues that trial counsel should have objected when, according to Appellant, the prosecutor told the jury during closing arguments that he believed several witnesses were telling the truth. As relevant here, the prosecutor made several comments in closing arguments about which witnesses were credible, saying:

> Carter's testimony was credible. You can believe him. Because . . . [h]e has no reason to lie [about Appellant]. He has nothing to gain from this. . . . And you see the video . . . corroborate [his testimony].
>
> . . .
>
> [Offord] wasn't there, but he testified – oh, he was the best – he was one of the most credible ones; wasn't he? . . . There's no "ums[,"] there's no thinking about it, nothing like that. He responds instantly. Looks us in the eye. He was telling the truth.
>
> . . .
>
> "Offord, *I think*, was one of the most credible people – they're all [referring to Offord and Mahoney] credible, *I think*, because they have nothing to lose. They're not going home or anything. They came in here in jumpsuits and shackles and said, "After this, I'm going back to prison." They're not going to walk out after this . . . because of what they said. They testified that they were told to tell the truth. They weren't told what to say. They were told to tell the truth and they did.
>
> . . .
>
> [I]f you have two possible solutions, one being there's a conspiracy [between several witnesses] . . . to frame

> [Appellant] . . . [o]r they're all telling the truth that he
> shot James Hawkins[,] . . . [w]hich one makes more
> sense?

(Emphasis supplied.)

Trial counsel was not deficient for failing to object to most of the prosecutor's remarks about witnesses' credibility because they were not comments about the prosecutor's personal beliefs but rather arguments about "reasonable inferences" the jury could draw about "the credibility of witnesses" "from the evidence," including from the witnesses' demeanor while testifying. *Jackson v. State*, 301 Ga. 774, 775-776 (3) (804 SE2d 73) (2017) (citation and punctuation omitted); *Mason v. State*, 274 Ga. 79, 79-80 (2) (b) & n.2 (548 SE2d 298) (2001) (holding that the prosecutor's statement about a witness's credibility in closing argument — "[h]e's telling you the truth[,] [h]e's telling you the honest truth" — was "the conclusion the prosecutor wished the jury to draw from the evidence, and not a statement of the prosecutor's personal belief as to the veracity of a witness"). See also *Stephens v. State*, 307 Ga. 731, 736-737 (2) (838 SE2d 275) (2020) (holding that counsel was not deficient for failing

to object to a prosecutor's comments about witnesses' credibility because the "comments were based on inferences from the evidence," and were not expressions of her "personal beliefs"). Cf. *Cook v. State*, 255 Ga. 565, 575 (12) (b) (340 SE2d 843) (1986) (holding that a prosecutor may argue in closing argument that "the jury [should] draw [particular] inferences from its observation of the demeanor of the witnesses," and that doing so does not "ask[ ] the jury to consider facts not in evidence").

We conclude, however, that trial counsel had reasonable grounds for objecting to one of the prosecutor's comments about witness credibility, namely, the prosecutor's comment that "I think" Mahoney and Offord were credible witnesses. See *Bell v. State*, 294 Ga. 443, 445 (2) (754 SE2d 327) (2014) ("It is well-settled that a prosecutor may not express to [the] jury his or her personal belief about the veracity of a witness."). But even assuming trial counsel's failure to object to that comment was objectively unreasonable and therefore constituted deficient performance, Appellant has not shown prejudice. Not only was the evidence against Appellant

45

strong, as noted above, but the court also mitigated any potential prejudice from the prosecutor's brief remark by properly instructing the jury after closing arguments that credibility issues were for the jury to decide and that attorney arguments were not evidence. See id. at 445-446 (2) (no prejudice from trial counsel's failure to object to a prosecutor's question that had the effect of "vouching" for a witness's credibility because there was "substantial evidence" of the defendant's guilt, and the court properly instructed the jury "that the credibility of the witnesses was for them to determine . . . , and that the evidence in the case does not include the opening statements or closing arguments by the attorneys or the questions asked by the attorneys"). See also *Lane v. State*, 312 Ga. 619, 624-625 (2) (b) (864 SE2d 34) (2021) (no prejudice from trial counsel's failure to object when the prosecutor improperly bolstered a witness's credibility in closing argument because "the State present[ed] substantial evidence of [the defendant's] guilt, [and] the trial court also instructed the jury that closing arguments were not evidence").

(g) Appellant argues that "at no point in time did defense counsel move for a directed verdict on" the count charging Appellant with conspiracy to commit armed robbery. And he argues that trial counsel was ineffective for failing to argue, in support of a motion for a directed verdict on the conspiracy count, that there was no trial evidence showing that any of the alleged coconspirators shot Hawkins with the intent to rob him.

By way of background, Count 1 of the indictment charged Appellant, Mahoney, and Offord with conspiracy to commit armed robbery and alleged that they committed several "overt acts to effect the object of the conspiracy." These alleged overt acts included Appellant, Mahoney, and Offord meeting at the motel to plan an armed robbery, Offord giving Mahoney a gun, Offord providing transportation to Appellant and Mahoney, Appellant and Mahoney thereafter traveling on foot to the motel, Appellant and Mahoney "assault[ing] and shoot[ing] James Hawkins[ ] with the intent to rob him," and Appellant, Mahoney, and Offord fleeing the scene in Offord's vehicle.

47

Here, Appellant has failed to show deficient performance. Contrary to Appellant's argument, trial counsel did move for a directed verdict on Count 1, and he made several arguments in support of that motion. And even assuming that the scope of trial counsel's motion for a directed verdict on Count 1 did not encompass the specific argument that there was insufficient evidence showing that Appellant and Mahoney shot Hawkins with the intent to rob him, failure to raise such an argument was not ineffective assistance. This is because, to prove the conspiracy charge, the State needed to show only that Appellant conspired with at least one other person to commit an armed robbery and that at least one member of the conspiracy engaged in an overt act to effect the object of the conspiracy. See *Wilson v. State*, 315 Ga. 728, 731 (2) (883 SE2d 802) (2023) (citing OCGA § 16-4-8). And the evidence described above was more than sufficient to show both that Appellant planned with Mahoney and Offord to commit an armed robbery at the motel, and that they engaged in several overt acts, including obtaining guns and traveling to the motel. Thus, a motion for a directed verdict on

this ground would have been meritless. See *Williams v. State*, 315 Ga. 797, 806 (2) (884 SE2d 877) (2023) (holding that failure to file a "meritless" motion for a directed verdict was not deficient performance).

6. Finally, Appellant argues that he suffered cumulative prejudice from the enumerated trial-court errors and instances of ineffective assistance of counsel. We disagree.

"[W]e must consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel." *Blocker v. State*, 316 Ga. 568, 583 (5) (889 SE2d 824) (2023) (citation and punctuation omitted). Establishing cumulative error requires a defendant to show that

> (1) at least two errors were committed in the course of the trial; and (2) considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the defendant a fundamentally fair trial.

*Beard v. State*, 317 Ga. 842, 852 (5) (896 SE2d 497) (2023) (citation and punctuation omitted).

Here, we assumed one trial-court error (the trial court's abuse

of discretion in allowing the State to cross-examine Appellant about his criminal history) and three instances of deficient performance (trial counsel's failure to object when the prosecutor asked Appellant about the whereabouts of his purported alibi, when the prosecutor equated proof beyond a reasonable doubt with mere belief in closing argument, and when the prosecutor said in closing argument that he thought two witnesses were credible). "[A]ssuming without deciding that [these types of] error c[an] be aggregated for cumulative-error review," we conclude that these errors were harmless, even when considered together. *Jackson v. State*, 317 Ga. 95, 107 (4) (891 SE2d 866) (2023). As explained above, Appellant's cross-examination about his criminal history had little, if any, prejudicial effect when considered in the context of his testimony as a whole. The prosecutor's questions about Appellant's purported alibi were relevant only to a weak alibi defense that defense counsel did not even pursue at trial. And the trial court's jury instructions mitigated any potential prejudice that might have otherwise resulted from the prosecutor's improper closing remarks about the

burden of proof and witnesses' credibility. Given that the assumed trial-court error and assumed instances of deficient performance resulted in, at most, minor prejudice to Appellant, and given that the trial evidence strongly supported the jury's guilty verdicts, Appellant has not established cumulative prejudice warranting a new trial.

*Judgment affirmed. All the Justices concur.*