NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: September 16, 2025

S25A0685.  PINION-LOPEZ v. THE STATE.

LaGrua, Justice.

Appellant Rodrigo Pinion-Lopez challenges his 2023 convictions for felony murder and other crimes in connection with the shooting death of Ivan Pastor-Vital.[1] In his sole enumeration of

---

[1] The crimes occurred on August 29, 2019. On December 18, 2019, a Gwinnett County grand jury indicted Pinion-Lopez, Jonathan E. Gonzalez, and Julio Cesar Perez-Duran for felony murder predicated on armed robbery (Count 1), armed robbery (Count 2), felony murder predicated on aggravated assault (Count 3), aggravated assault (Count 4), felony murder predicated on conspiracy to commit the offense of possession of methamphetamine with intent to distribute, in violation of the Georgia Controlled Substances Act, OCGA § 16-13-30 (b) (Count 5), and conspiracy to commit the offense of possession of methamphetamine with intent to distribute (Count 6). Pinion-Lopez and Perez-Duran were also charged with possession of a firearm during the commission of a crime (Count 7), and a fourth defendant, Gonzalez's girlfriend Geraldy Gomez, was charged only with possession of a Schedule I Controlled Substance (Count 8). Gonzalez pleaded guilty to lesser offenses and testified against Pinion-Lopez, Perez-Duran has not been apprehended, and the record does not reflect the disposition of Gomez's charge. Pinion-Lopez was tried from May 8 to 12, 2023, and the jury found him guilty of felony murder (Count 5), conspiracy to violate the Georgia Controlled Substances Act (Count 6), and the firearm possession charge (Count 7). He was acquitted on Counts

error, Pinion-Lopez contends that the evidence was legally insufficient to support his conviction for felony murder predicated on conspiracy to violate the Georgia Controlled Substances Act. As explained below, the evidence, including Pinion-Lopez's custodial statements and trial testimony, was constitutionally sufficient. Accordingly, we affirm.

Viewed in the light most favorable to the verdicts, the evidence demonstrated that, on August 29, 2019, Pinion-Lopez, either individually or as a party to the crime, fatally shot Pastor-Vital at the Intown Suites hotel in Gwinnett County, where one co-defendant, Jonathan Gonzalez, rented a room. Gonzalez pleaded guilty to lesser charges and testified against Pinion-Lopez, who was also known as "Pelon." According to Gonzalez, he was staying in a room on the third floor of the hotel with his girlfriend and their two

1–4. The trial court sentenced Pinion-Lopez to serve life in prison without the possibility of parole and a consecutive term of five years for the firearm possession charge; the conspiracy count merged. On June 2, 2023, Pinion-Lopez filed a motion for new trial, which he amended through new counsel on November 12, 2024. After an evidentiary hearing on November 14, 2024, the trial court entered an order denying the motion on December 2, 2024. Appellant filed a timely notice of appeal, and the case was docketed in this Court to the April 2025 term and submitted for a decision on the briefs.

children. On August 29, he was trying to get money to pay for the room for the next month. Pastor-Vital, a close friend of Gonzalez's, offered to give Gonzalez money if Pastor-Vital could use Gonzalez's room to complete a sale of drugs to Pinion-Lopez and another co-defendant, Julio Cesar Perez-Duran. Gonzalez also knew Pinion-Lopez and Perez-Duran and agreed to allow Pastor-Vital to use his hotel room. Gonzalez met Pinion-Lopez in the parking lot of the hotel, and the two went to Gonzalez's room. When Perez-Duran arrived, he came up to the room. Pinion-Lopez or Perez-Duran called Pastor-Vital, and then Pinion-Lopez, Perez-Duran, and Gonzalez left to go to the store to buy "cigarillos." When the three men returned to the hotel, Pinion-Lopez and Perez-Duran went up to Gonzalez's room, and Gonzalez went to a stairwell to conduct another drug transaction; Gonzalez's girlfriend and children remained in the room and were in the bathroom while the children took a bath. About five minutes later, Gonzalez heard two gunshots and his girlfriend screaming, so he ran back to the room. He saw Pastor-Vital on the ground, and Gonzalez's girlfriend said that

3

"Pelon" shot him. Gonzalez fled the hotel with his family, and shortly thereafter, he received phone calls from Pinion-Lopez and Perez-Duran telling him to "shut the f**k up" and threatening to kill him and his family.

Pastor-Vital died at the scene from two gunshot wounds to the torso. Officers from the Gwinnett County Police Department investigated the scene and obtained surveillance videos showing the entrances and exits of the hotel around the time of the shooting. Several video clips were played at trial. Gonzalez's testimony was consistent with the videos. There were two .45 caliber shell casings found at the scene, along with an old .38 caliber revolver, which could not have fired the .45 caliber shell casings. The murder weapon was never recovered. Officers also obtained phone records showing that, in the three months before the shooting, there were many communications among Pinion-Lopez, Perez-Duran, and Gonzalez.

On September 19, officers located and arrested Pinion-Lopez at

his apartment in Norcross. Pinion-Lopez waived his *Miranda*[2] rights, which were read to him in his native language of Spanish, and was interviewed by a Spanish-speaking officer.[3] After a break, the lead investigator, Sargeant Micah Hegwood of the Gwinnett County Police Department, joined them and asked questions about Pinion-Lopez's story. Pinion-Lopez initially said that he went to the hotel room to purchase a small amount of marijuana and smoke it with the occupants and that he did not have a gun. At first, he said that the shooting was an accident, and then, he said that Perez-Duran and Pastor-Vital both pulled guns, and when Perez-Duran's gun went off, Pinion-Lopez grabbed Pastor-Vital's backpack and gun and ran out of the room. Pinion-Lopez said that Gonzalez was in the hotel room and an unknown man was also there, and after the shooting, Pinion-Lopez left with Perez-Duran, and they met up with

---

[2] See *Miranda v. Arizona*, 384 US 436 (1966).

[3] The interview was audio and video-recorded, and the portions that were in English were played at trial. A transcript of an English translation of the entire interview was introduced at trial.

Gonzalez and gave him the backpack with the drugs and the gun. When confronted with surveillance videos from the hotel that contradicted his story, Pinion-Lopez admitted that Gonzalez had not been in the room when Pastor-Vital was shot and that Pinion-Lopez had been there to "do a drug deal."

Two weeks later, Pinion-Lopez asked to speak with officers, and he was interviewed by Sargeant Hegwood, with Officer Brian Dorminy serving as interpreter.[4] During the interview, Pinion-Lopez said he went to the hotel to conduct a drug deal, but he began to suspect that there would be a robbery. He and Perez-Duran both had guns. After Pastor-Vital reached for his own gun, Perez-Duran shot Pastor-Vital. Perez-Duran told Pinion-Lopez to take Pastor-Vital's backpack, which contained approximately $40,000 worth of methamphetamine, $70,000 worth of heroin, and a gun. Pinion-Lopez took the backpack and ran out with Perez-Duran. Pinion-Lopez later sold the gun and gave the drugs to Gonzalez.

Pinion-Lopez testified at trial through an interpreter.

---

[4] The interview was audio- and video-recorded and played at trial.

According to Pinion-Lopez's testimony, Gonzalez called him and asked him if he wanted to make some money by picking up some drugs and taking them to another location. Pinion-Lopez understood that he would be doing a "drug deal" involving methamphetamine. Pinion-Lopez agreed and drove to Gonzalez's hotel, where he met Gonzalez in the parking lot and went to Gonzalez's room, where Gonzalez's girlfriend and their two small children were also present. Perez-Duran, who arrived shortly thereafter, appeared to be on drugs. Then the three men went to a store to get papers to smoke marijuana. When they returned to the hotel parking lot, Pinion-Lopez, who was not armed, realized the drug transaction was going to be dangerous when he saw Perez-Duran had a gun. Pinion-Lopez went to Gonzalez's hotel room with Perez-Duran while Gonzalez went to talk to another woman.

Gonzalez's girlfriend opened the door, and Pinion-Lopez saw Pastor-Vital, whom he had never seen before. Perez-Duran started talking to Pastor-Vital, and it was obvious the two men knew each other. The conversation turned angry, with Pastor-Vital asking

7

Perez-Duran about "money he was behind on." The men then switched to English, which Pinion-Lopez did not understand, and were yelling at each other. Pastor-Vital pulled a gun from the back of his waistband, and Pinion-Lopez then heard shots. He was not able to see who had fired the shots until he saw Pastor-Vital fall to the ground. Perez-Duran told Pinion-Lopez to pick up Pastor-Vital's gun. Pinion-Lopez picked up the gun because Perez-Duran had a weapon and was "on drugs" and because Pastor-Vital was "still alive and he could shoot." Pinion-Lopez also picked up the backpack containing drugs, which he had started inspecting when he walked in the room.

Pinion-Lopez and Perez-Duran then ran out of the room to the parking lot. Pinion-Lopez wanted to get in his own car, but Perez-Duran told him to get in Perez-Duran's car. Even though Pinion-Lopez had picked up Pastor-Vital's gun, he did not turn it on Perez-Duran because, "I can't use a weapon. I'm not a criminal . . . to, like, kill people or to be in criminal things like that, I've never been in. I don't have a criminal record." When they were in the car, Perez-

Duran said they were going to leave the state, but Pinion-Lopez responded that he did not "have to leave here." Pinion-Lopez told the jury, "I didn't feel guilty and I don't feel guilty."

Perez-Duran drove them to a house where Gonzalez was, and Perez-Duran and Gonzalez spoke briefly in Spanish. Gonzalez asked for the drugs and also asked, "why did he do that." Perez-Duran responded that "he knew what was going to happen because of the money that was owed." Then Gonzalez and Perez-Duran started speaking in English. Pinion-Lopez was dropped off at his apartment by Perez-Duran, and he never saw Perez-Duran or Gonzalez again. Pinion-Lopez gave the gun to someone who sold it to a security guard at a nightclub; Pinion-Lopez received $300 for it. At one point, Pinion-Lopez said his statements to police were "the truth" because he told them that he had gone to the hotel to do a drug deal, but he also said that he was not truthful in his first interview because he was scared and on drugs. He said that he asked to speak to officers for the second interview because he had been assaulted by Perez-Duran's "friends," who were trying to scare him.

9

1. Pinion-Lopez asserts that the evidence was insufficient as a matter of constitutional due process. See *Jackson v. Virginia,* 443 US 307, 319 (1979). Specifically, he contends that the evidence was insufficient to show that he was engaged in the conspiracy alleged in the indictment — possession of methamphetamine with intent to distribute — and that the evidence failed to show that the conspiracy was the proximate cause of Pastor-Vital's death.  We disagree.

We evaluate a challenge to the constitutional sufficiency of the evidence by viewing the evidence in the light most favorable to the verdicts, asking whether the evidence presented at trial was sufficient to authorize a rational trier of fact to find the appellant guilty beyond a reasonable doubt of each essential element of the crimes for which he was convicted. See *Weems v. State,* 318 Ga. 98, 101 (2024) *(*citing *Jackson* 443 US at 319). "In making this determination, we do not evaluate witness credibility, resolve inconsistencies in the evidence, or assess the weight of the evidence; these tasks are left to the sole discretion of the jury." *Ridley v. State*, 315 Ga. 452, 455 (2023).

(a) Although Pinion-Lopez asserts now that the evidence was not sufficient to find him guilty of a conspiracy to possess methamphetamine with intent to distribute, he testified at trial that he agreed, at Gonzalez's request, to pick up methamphetamine and deliver the drugs to another location, thus admitting the elements of the felony of conspiracy to possess methamphetamine with intent to distribute under OCGA §§ 16-4-8 and 16-13-30(b).[5] Additionally, Pinion-Lopez's testimony that he drove to the hotel as part of that plan established the completion of an overt act in furtherance of the conspiracy. See *Washington v. State*, 320 Ga. 839, 860 (2025) (noting that evidence that co-conspirators engaged in an overt act in the furtherance of conspiracy to commit armed robbery included

---

[5] OCGA § 16-4-8 provides: "A person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy." OCGA § 16-13-30(b) provides: "It is unlawful for any person to ... distribute or possess with intent to distribute any controlled substance," and methamphetamine is a controlled substance. See OCGA § 16-13-26(3)(B). Additionally, "'[d]istribute' means to deliver a controlled substance, other than by administering or dispensing it," OCGA § 16-13-21(11). And "'[d]eliver' means the actual, constructive, or attempted transfer of a controlled substance from one person or another." OCGA § 16-13-21(7).

traveling to the location where they planned to commit the armed robbery). Thus, Pinion-Lopez's claim that there was insufficient evidence of a conspiracy fails.

(b) In arguing lack of proximate cause, Pinion-Lopez raises two related issues. He asserts that, because he was not aware of a plan to buy the drugs or to rob Pastor-Vital, his actions — driving to the hotel to pick up drugs to take them someplace else and his communications with Gonzalez — were not inherently dangerous, and that Pastor-Vital's death was not a reasonably foreseeable consequence of those actions. His claims fail.

A person commits felony murder when, "in the commission of a felony, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1. Any felony that is "inherently dangerous to human life" or "by its circumstances create[s] a foreseeable risk of death" may serve as a predicate for felony murder. *Davis v. State*, 290 Ga. 757, 760 (2012). Additionally, the causation element requires proof of proximate cause, which is "satisfied for purposes of felony murder when the death was a

12

reasonably foreseeable result of the criminal conduct at issue … even if the death had an intervening act, so long as that intervening act was itself a reasonably foreseeable consequence of the criminal conduct." *Sinkfield v. State*, 318 Ga. 531, 537 (2024) (cleaned up).

We have long held that "transactions involving illegal drugs are inherently dangerous" and carry the reasonably foreseeable consequence that "something may go wrong and someone may be killed." *Wilson v. State*, 315 Ga. 728, 733–34 (2023). Thus, contrary to Pinion-Lopez's argument, a conspiracy to possess methamphetamine with intent to distribute is inherently dangerous for purposes of determining a predicate for felony murder. See id.

Pinion-Lopez claims that he was not aware of a plan to buy the drugs or to rob Pastor-Vital and that, therefore, Pastor-Vital's death was not a reasonably foreseeable consequence of merely driving to the hotel to pick up drugs to take them someplace else. However, the jury was authorized to disbelieve Pinion-Lopez's testimony, see, e.g., *Foots v. State*, ___ Ga. ___ (2025), S25A0646 slip op. at 8, (Ga. June 24, 2025), and find, based on the evidence recounted above, that

13

"something went wrong" during the conspiracy to possess methamphetamine with intent to distribute and that Pastor-Vital's death was the reasonably foreseeable consequence of the conspiracy. See *Wilson*, 315 Ga. at 733–34 (concluding that evidence was sufficient for jury to conclude that conspiracy among Wilson and several others to purchase marijuana from a drug dealer proximately caused the death of the dealer); *Davis*, 290 Ga. at 760 (holding that the evidence was sufficient to show that Davis's participation in a drug transaction with the victim was the proximate cause of the victim's death). Thus, the evidence was sufficient to establish that Pastor-Vital's death was a reasonably foreseeable consequence of the conspiracy to possess methamphetamine with intent to distribute. See *Clements v. State*, 317 Ga. 772, 784–85 (2023) (holding that it was reasonably foreseeable that someone would be killed during the commission of "the dangerous criminal activities" that the defendant and his co-conspirators were engaged in). Additionally, the illegal drug conspiracy in which Pinion-Lopez participated was an inherently

dangerous felony. See *Wilson*, 315 Ga. at 733–34 (recognizing that conspiracy to purchase marijuana was inherently dangerous).

In conclusion, when properly viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient as a matter of constitutional due process to authorize a rational jury to find Pinion-Lopez guilty beyond a reasonable doubt of conspiracy to possess methamphetamine with intent to distribute and felony murder predicated on that conspiracy. See *Wilson*, 315 Ga. at 733–34; *Davis*, 290 Ga. at 760.

*Judgment affirmed. All the Justices concur.*