**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: September 30, 2025

S25A0762.  EVANS v. THE STATE.
S25A0763.  MILLER v. THE STATE.

COLVIN, Justice.

Appellants Nicholas Evans and Khalil Demonte Miller appeal their convictions and sentences for malice murder, armed robbery, aggravated assault, and violations of the Street Gang Terrorism and Prevention Act ("Gang Act"), in connection with the shooting death of Willian Tunchez and the robberies of Joshua Wei, William Yeon, Kameron Russell, and Jocques Arrington.[1] On appeal, Miller argues

---

[1] The crimes occurred over a three-day period in October 2018. On February 27, 2019, a Gwinnett County grand jury returned a 21-count indictment against Evans, Miller, Franecha Torres, Brandon Adams, Jaleel Yahtic Grant, and Manuel Davila. In connection with the shooting death of Tunchez on October 7, 2018, Evans, Miller, Torres, and Adams were jointly charged with malice murder (Count 1), felony murder (Counts 2 and 3), armed robbery (Count 4), aggravated assault (Count 5), and a Gang Act violation under OCGA § 16-15-4(a) predicated on armed robbery (Count 6); and Miller and Adams were separately charged with a Gang Act violation under OCGA § 16-15-4(d) predicated on armed robbery (Count 7). In connection with the

robbery of Wei and Yeon on October 5, 2018, Evans and Torres were jointly charged with armed robbery (Counts 8 and 9), aggravated assault (Counts 10 and 11), and a Gang Act violation under OCGA § 16-15-4(a) predicated on armed robbery (Count 12). In connection with the robbery of Russell on October 6, 2018, Evans, Miller, Torres, Adams, and Davila were jointly charged with armed robbery (Count 13), aggravated assault (Count 14), and a Gang Act violation under OCGA § 16-15-4(a) predicated on armed robbery (Count 15). In connection with the robbery of Arrington on October 7, 2018, Evans, Miller, Torres, Adams, Grant, and Davila were charged with armed robbery (Count 16), aggravated assault (Count 17), and a Gang Act violation under OCGA § 16-15-4(a) predicated on armed robbery (Count 18); and Miller and Adams were separately charged with a Gang Act violation under OCGA § 16-15-4(d) predicated on armed robbery (Count 19). Finally, in connection with a gang-initiation fight on October 6, 2018, Evans, Miller, Adams, and Davila were jointly charged with affray (Count 21) and a Gang Act violation under OCGA § 16-15-4(a) predicated on affray (Count 20).

Before trial, Adams and Grant agreed to testify for the State without the benefit of a plea agreement. Evans, Miller, and Torres were then jointly tried before a jury from December 4 through 13, 2023. The jury found Evans guilty of Counts 1 through 6 and 8 through 18 and not guilty of Counts 20 and 21. The jury found Miller guilty of Counts 1 through 7 and 16 through 19 and not guilty of Counts 13 through 15 and 20 through 21. Finally, the jury found Torres guilty of Counts 1 through 6 and 8 through 18.

The trial court sentenced Evans to life in prison without the possibility of parole for malice murder (Count 1), to concurrent terms of life in prison for each armed robbery count (Counts 4, 8, 9, 13, and 16), and to concurrent 20-year terms of imprisonment for each Gang Act violation (Counts 6, 12, 15, and 18). The felony murder counts (Counts 2 and 3) were vacated by operation of law. And the court merged for sentencing purposes the aggravated assault counts (Counts 5, 10, 11, 14, and 17) with the armed robbery counts (Counts 4, 8, 9, 13, and 16).

The trial court sentenced Miller to life in prison without the possibility of parole for malice murder (Count 1), to concurrent terms of life in prison for one count of armed robbery (Counts 4) and for one count of aggravated assault (Count 17), to a concurrent term of 20 years in prison for the other armed robbery count (Count 16), to 20-year concurrent terms in prison for two of the Gang Act counts (Counts 6 and 19), and to a consecutive 20-year term of imprisonment for a third Gang Act Count (Count 7). The felony murder counts (Counts 2 and 3) were vacated by operation of law. And for sentencing

that the trial evidence was insufficient under Georgia's circumstantial-evidence statute (OCGA § 24-14-6) to find him guilty of the crimes against Tunchez and Arrington; Evans and Miller each raise several ineffective-assistance-of-trial-counsel claims; Miller argues that the trial court made several merger-related sentencing errors; and the State raises a merger issue, as well. As to Miller, the State concedes, and we agree, that the trial court erred in failing to merge for sentencing purposes Count 17 (aggravated assault of Arrington) with Count 16 (armed robbery of Arrington). But for the reasons explained below, we reject Evans's and Miller's other claims of error, and we decline to address the merger issue identified by the State. Accordingly, we affirm the judgment in Evans's case and affirm in part and vacate in part the judgment in Miller's case.

purposes, the court merged the other aggravated assault count (Count 5) with one of the armed robbery counts (Count 4) and merged one of the Gang Act counts (Count 18) with its predicate charge of armed robbery (Count 16).

Evans timely filed a motion for new trial on December 15, 2023, and amended the motion through new counsel on August 23, 2024. Miller timely filed a motion for new trial through new counsel on December 21, 2023, and amended the motion on August 30, 2024. On December 19, 2024, the trial court denied Appellants' motions for new trial. Appellants each timely filed a notice of appeal directed to this Court. The cases were docketed to this Court's April 2025 term and submitted for a decision on the briefs.

1. The trial evidence showed the following. Between Friday, October 5 and Sunday, October 7, 2018, a string of armed robberies occurred within walking distance of Evans's home in Suwanee.

That weekend, a group of approximately ten teenagers (including Evans, Miller, Franecha Torres, Brandon Adams, Jaleel Grant, Manuel Davila, and Sophia Beck) were at Evans's house.[2] Beck testified that "everyone" at Evans's house "except for [Torres]" held themselves out to be gang members. And Adams testified that members of two non-rival gangs, the Crips and the Gangster Disciples, were present.

Adams said he was a member of the Crips at the time, and Adams and Grant both testified that Miller and Evans were members of the Gangster Disciples. The State's gang expert testified that the Gangster Disciples was a traditional street gang with "over 10,000 [validated members] in the state of Georgia" and "[a] pretty

---

[2] As noted below, the robbery victims identified the suspects by race and approximate age. The record indicates that Evans and Torres are Hispanic, that Miller, Grant, and Davila are black, that Adams is white, and that they were all around 17 years old when the crimes occurred.

good stronghold in Gwinnett County as well." According to Adams and Grant, Miller was a "big homie," which Grant described as a "leader." And Adams and Grant testified that Davila and Grant were "jumped into" the Gangster Disciples that weekend, meaning that they became gang members by fighting other members of the gang.

That weekend, Adams heard Miller tell other Gangster Disciples members, including Evans, Davila, and Grant, to "put in work" for the gang, which, as Adams explained, meant that they needed to engage in conduct, such as "[h]itting a lick" (that is, committing a robbery), that would produce money or status for the gang and give the perpetrator "stain" (that is, "rank" or status in the gang).[3] Adams, who carried a 9mm Ruger pistol in a fanny pack, said that, several times throughout the weekend, he gave his gun to Evans, who would then leave the house with others to commit robberies and return with various items, including cell phones,

---

[3] The State's gang expert testified that robberies benefitted the Gangster Disciples because newer members were able to put in work to show that they were valuable assets to the gang, and the members were able to divide the proceeds.

cigarillos, and watches. And Beck testified that she saw various items at Evans's house that she understood had been stolen, including phones, watches, and wallets.

*Robbery of William Yeon and Joshua Wei*

The first armed robbery at issue on appeal occurred on October 5, 2018. The victims of that robbery, William Yeon and Joshua Wei, testified that they drove to their coworker's apartment complex in Suwanee, Georgia, parked, and started walking toward their coworker's apartment. As they were walking, a Hispanic female, whom they later identified in photo lineups as Torres, approached them and asked for either a "hotspot" for "WiFi" or a "charger." Yeon testified that he told her "no" and "just ke[pt] walking." Wei, however, "paused." According to Wei, a high-school-aged Hispanic male then "pulled out a gun," "pointed it at [him]," "loaded a bullet into the chamber" by racking the slide, and said "something along the lines of … don't move … [and] give him whatever [they] had." The female then started telling him to give her various items, and he complied, giving her his Movado watch, which was worth over

6

$1,000, as well as his iPhone and a vape.

Yeon realized that Wei was no longer walking behind him and backtracked. When Yeon found Wei, he saw a 17-to-19-year-old Hispanic male pointing a gun at Wei's face, as well as the Hispanic female standing next to Wei. Yeon said that the Hispanic male then pointed the gun at him, that both the male and the female told him to hand over his possessions, and that he gave them his iPhone. After Yeon and Wei turned over their possessions, the Hispanic male and female told Yeon and Wei to turn around and walk away without looking back, which they did.

Data later recovered from Miller's cell phone pursuant to a search warrant revealed that, on the day after Yeon and Wei's robbery, Miller ran searches related to various iPhones and Movado watches, and he also took a photo showing three phones, at least one of which appeared to be a phone taken in the robbery of Yeon and Wei, with a caption indicating that he was trying to sell the phones. And when officers executed search warrants for Evans's and Torres's residences several days after the crimes, they found Wei's Movado

7

watch in Evans's bedroom and Wei's vape in Torres's bedroom.

*Robbery of Kameron Russell*

The second armed robbery occurred at 12:30 a.m. on October 6, 2018. The victim of that robbery, Kameron Russell, testified that, at that time, he was sitting in his car with the windows rolled down in the parking lot of an apartment complex in Suwanee. Russell said that a 16-to-17-year-old Hispanic female, whom he later identified in a photo lineup as Torres, approached the driver's side window, asking for a phone charger. According to Russell, he "dismissed" the female, but then an approximately 20-year-old black male approached the passenger side window, pointed a gun at him, and said something along the lines of "give me what you got." Russell said that another black male and an approximately 18-year-old Hispanic male rummaged through the back seat and trunk of his car, while the female was laughing and talking about taking specific items.[4] The perpetrators took Russell's wallet, iPhone, and custom

_____

[4] At trial, the prosecution played for the jury a jail call made by Torres after the court had adjourned for the day in which Torres said that she was not

baseball hat. And pursuant to a search warrant executed several days after the crimes, officers found Russell's iPhone and custom baseball hat in Evans's bedroom.

*Robbery of Jocques Arrington*

The third robbery occurred just after midnight on October 7, 2018. Grant testified that he participated in the robbery after being "jumped into" the gang earlier that day. According to Grant, Evans and Torres came up with the idea of committing the robbery, saying, "let's go out, hit a lick." Grant testified that he heard Evans tell Miller to tell Davila that Davila had to participate in the robbery. And Adams testified that he heard Miller tell Evans and Davila to "put in work" and "bring back $50." Grant said that Evans had a gun in a fanny pack, and that the plan was for Torres to approach the target.

Grant testified that he, Evans, Torres, and Davila walked from Evans's house to an apartment complex where Evans said he had

the person who was laughing, and that "the person who was laughing was Manny [Davila]."

9

committed previous robberies, but that they were unable to commit a robbery there because police cars were present. The group then walked to some hotels, where they saw a car pull up and the victim of the third robbery (Jocques Arrington) get out.

Arrington testified that, after a rideshare dropped him off in the parking lot of a hotel, "a young lady," who appeared to be Hispanic, approached him and asked to use his phone. According to Arrington, two young black males and a young Hispanic male then approached him. Grant testified that Evans gave him the gun, and that Grant pointed the gun at Arrington while telling Arrington to give them his possessions. But according to Grant, Arrington "froze," so Evans took the gun from him, "cocked it back" (meaning that he "rack[ed] the slide"), and told Arrington to give them what he had. Arrington similarly testified that a Hispanic male pointed a gun at his face and told him to hand over "everything."

Arrington and Grant both testified that the female (whom Grant identified as Torres) tried to get Arrington to "wipe" his iPhone so they could take it, but that Torres's attempt was

10

unsuccessful. Grant further testified that, at Evans's direction, Davila took some of Arrington's possessions, and then the group ran away.

Surveillance footage from the hotel captured portions of the robbery, and both Adams and Grant identified the people committing the crime as Evans, Torres, Grant, and Davila. Footage from a first surveillance camera showed the following: Arrington got out of a car, and a female in white shorts (Torres) approached him; then a male wearing long pants and white shoes (Grant) approached Arrington and pointed a gun at him; and finally, a male wearing white shorts (Evans) and another male (Davila) approached Arrington, at which point the video ended. And footage from a second surveillance camera showed two males (Grant and Davila) fleeing the scene, followed by the female in white shorts (Torres) and the male in white shorts (Evans).

According to Arrington, the perpetrators took his three-pack of condoms, Apple headphones, and cigarillos. And when officers arrested Miller several days after the crimes occurred, they found

on his person a three-pack of condoms of the same brand, as well as Apple headphones.

*Murder of Willian Tunchez*

According to Adams and Beck, in the afternoon of Sunday, October 7, they were sitting around a table in Evans's backyard with a group of people that included Evans, Miller, and Torres. Torres was messaging a Hispanic male, whom Beck identified as Tunchez, through a social media application. And Torres told Beck that Tunchez "was offering her money to sleep with him."

Torres and Evans were dating at the time, and Torres said she would not sleep with the man she was messaging. But Evans then brought up money, and Miller joined the conversation. According to Adams, Evans said that "if the dude wanted to do something, he had to pay for it," which Adams understood to mean that the man would have to pay for sex with Torres. And Beck testified that Torres said, "We should just rob this guy."

Officers later obtained messages from Tunchez's social media account. Tunchez's messages showed that he had been

communicating with more than 15 young women and offering to pay them for "sex" or "sexy photos." One of those young women was Torres, who had started communicating with Tunchez about two months before the homicide. Tunchez's messages revealed that Torres had previously sent Tunchez provocative photos, including partially nude photos, in exchange for money, and the messages also indicated that Torres and Tunchez had previously met up to have sex.

On the day he died, Tunchez exchanged messages with Torres over a period of several hours until the last message was sent at 7:53 p.m. The messages showed that Torres suggested that Tunchez come to her friend's house and have "a threesome" with her and her friend in exchange for $300 in cash, and that Tunchez agreed to do so. Torres told Tunchez to come to an address in Evans's neighborhood, which the record shows was near a pathway leading into the woods, where Tunchez's body was later found.

Tunchez and his brother drove to a convenience store because Tunchez said he wanted to get $300, and surveillance footage from

13

the convenience store showed Tunchez retrieving cash from an ATM. According to Tunchez's brother, Tunchez then dropped him off at home and drove away alone around 7:40 p.m.

Adams testified that Evans asked Adams for the gun, and that Adams gave Evans the fanny pack containing the gun, knowing that they were going to commit a robbery. According to Beck, Evans, Miller, and Torres then "kind of disappeared," and Adams told her that they were "taking care of something."

A neighbor who lived across the street from the pathway where Tunchez's body was later found testified that, at dusk on October 7, he saw three people standing across the street near the pathway, namely, a black male, a Latino male, and a Latino female, all of whom appeared to be between 16 and 21 years old. The neighbor's son testified that he also saw two males and a female standing across the street near the top of the pathway, and he identified one of the males as Evans, whom he knew from the neighborhood.

Photos that were taken shortly before Tunchez's shooting, which were later recovered from Miller's cell phone pursuant to a

search warrant, appeared to show Miller at the scene of the shooting and holding a gun. And Adams testified that Evans sent a text message saying that "Shordi's gettin[g] nervous," which Adams understood as a possible reference to Torres being nervous. At 7:53 p.m., messages recovered from Tunchez's social media account indicated that Tunchez sent Torres a message indicating that he had arrived, and Torres responded, "OK I'm outside."

Around 8:00 p.m., a gunshot was heard throughout the neighborhood, and several people in Evans's backyard ran to the front of the house. Shortly thereafter, Adams, who was standing in front of Evans's house, saw Miller running back to the house. And "[a] little while later," Evans and Torres returned to Evans's house, as well. When Evans returned, he had possession of the gun. And Adams said that Miller was "[v]ery stressed," Evans was "in a state of shock," and Torres was "hysterical." Adams further said that, although he did not know why, Miller told Evans to go back to the scene of the shooting, and Evans did so before returning to Evans's house. And Grant testified that Miller, Evans, and Torres later told

15

him that "somebody came back" to the crime scene.[5] Adams said that Miller retrieved Adams's gun from Evans and gave it back to Adams, who sold it shortly after the shooting.

According to Adams, Miller told him that, "in their attempt to rob the man, something had went wrong" or "went awry," "and the gun had came out[,] and he [the victim] had got shot" by "Evans." When asked if he had "any discussion" with Evans about "attempt[ing] to rob the guy and the gun [going] off," Adams responded that he had discussed the matter with Evans "[a]t some point before [Adams] left [the house]." And text messages recovered from Miller's phone showed that, at 9:51 p.m., Miller sent Evans a text message, saying, "We gotta dip tonight low-key."

Grant testified that, at night after the shooting, he met up with Miller, Evans, and Torres at Miller's house. Grant said that Miller,

---

[5] The record supports an inference that Evans returned to the scene to retrieve Tunchez's wallet, Tunchez's phone, or a spent shell casing, which officers did not find at the scene. As noted below, Evans, Miller, and Torres later told Grant that they had burned Tunchez's wallet, Miller asked Grant to dispose of Tunchez's cell phone, and officers recovered from Miller's house a shell casing consistent with the bullet that killed Tunchez.

16

Evans, and Torres collectively told him what had happened, during a conversation in which "[a]ll three of them was talking at the same time," and "[t]hey all was telling me parts." According to Grant, in that conversation, Miller, Evans, and Torres said the following:

> [Evans] had a party at his house. While he was at the party, [Torres] had a lick. The victim wanted to have sex for some money, so [Torres] and [Evans] wanted to rob him for the money instead of her having sex. So they told him to pull up to the shortcut that's in [Evans's] neighborhood. … [Miller] went with them to be an extra man. … [T]he victim pulled up to the shortcut and [Evans] points the gun at him and I guess the victim just reached for the gun and they got to wrestling for it and [Evans] shot him … [while] [Miller] was trying to hit the victim with a stick so he can get off [Evans]. … [Then] [e]verybody ran back to the party.

Grant further testified that Miller, Evans, and Torres said that they had burned the victim's wallet, and that Miller asked Grant for help getting rid of the victim's phone, although Grant never saw or took possession of the phone.

*Events Following the Day of Tunchez's Murder*

The day after the shooting, a child who lived in Evans's neighborhood discovered Tunchez's dead body lying on the stairs of

17

the pathway leading into the woods. Officers arriving on the scene discovered Tunchez's body on a portion of the pathway that was "heavily wooded" and could not be seen from the street. A crime scene specialist observed a gunshot wound to Tunchez's neck and located his bloody keys several feet away from his body. From the bloodstains at the scene, the crime scene specialist concluded that Tunchez had been shot where his keys were found, and that he had attempted to walk up the stairs before collapsing. Officers were unable to locate a shell casing at the crime scene. Nor were they able to locate Tunchez's cell phone, Tunchez's wallet, or any cash at the scene of the shooting or in Tunchez's vehicle, which officers found parked down the street.[6]

Pursuant to a search warrant for Miller's cell phone, officers discovered that Miller had searched for news about Tunchez's homicide before and after Tunchez's body was found. And when

---

[6] The State introduced into evidence a recorded jail call made by Torres after images of Tunchez's body had been published at trial. During the call, Torres said, "I'm upset because I had never seen his body… . Like, I saw him when he, you know, everything happened, but I didn't see, I didn't see that, you know, so it caught me off guard."

executing search warrants for the defendants' residences, officers recovered several items in addition to those noted above. Specifically, officers found at least five cell phones and two 9mm shell casings in Miller's apartment. They found more than one cell phone and what an officer estimated was "probably close to a thousand" dollars in cash in Torres's bedroom.[7] And they found Miller's ID card, two wallets, and handwritten rap lyrics on notebook paper in Evans's bedroom.

The handwritten rap lyrics found in Evan's bedroom included phrases like "Me and my G's," "my cuzzos … they some crips," "we like to shoot big b's," "[h]ittin licks and taking sticks," "Ima shoot you," "[h]ollow tips rip through his neck," and "[d]elete the body then hide the shotty." And the State's gang expert testified that the lyrics indicated that Evans was a member of the Gangster Disciples because they included abbreviations (such as "G" or "GD" to refer to Gangster Disciples and "B" to refer to the rival Bloods gang) and

---

[7] On cross-examination, the officer agreed that a photograph of the cash admitted into evidence showed that one of the bills had text on it reading, "For motion picture purposes only."

vernacular (such as use of the word "licks" to refer to robberies and the word "sticks" to refer to guns) commonly used by members of the gang.

The medical examiner testified that Tunchez died from a single gunshot wound to the front, right side of his neck, which was fired from approximately six to eight inches away. The medical examiner recovered from Tunchez's body a medium-caliber hollow-point bullet. And although the gun was never recovered, the State's firearms expert testified that the 9mm hollow-point bullet recovered from Tunchez's body was consistent with a Federal design, and that one of the two 9mm shell casings recovered from Miller's residence was manufactured by Federal.

2. On appeal, Miller argues that the circumstantial evidence presented at trial was insufficient to exclude the reasonable hypothesis that Miller abandoned participation in the crimes against Tunchez before completion of those crimes. He also argues that the circumstantial evidence was insufficient to exclude the reasonable hypothesis that he was not a party to the crimes against

20

Arrington, particularly because he was not present when those crimes occurred. These arguments fail.

OCGA § 24-14-6 provides that, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." "But if there is any direct evidence presented by the State, the circumstantial evidence statute does not apply in a sufficiency analysis." *Troutman v. State*, 320 Ga. 489, 492 (2024) (quotation marks omitted). And here, the State presented direct evidence that Miller was a party to the crimes against Tunchez and Arrington. See OCGA § 16-2-20(b)(3), (4) (providing, in relevant part, that a person is a party to a crime if he "[i]ntentionally aids or abets in the commission of the crime" or "[i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime").

As to the crimes against Tunchez, Adams and Grant both provided direct evidence of Miller's guilt in the form of testimony that Miller admitted to participating in the crime. See *Troutman*,

21

320 Ga. at 492 (holding that a defendant's confession to a trial witness is direct evidence). Specifically, Adams testified that Miller said Tunchez was shot during "their" (meaning Miller, Evans, and Torres's) "attempt to rob [Tunchez]." And Grant similarly testified that Miller, Evans, and Torres collectively admitted to Grant that they planned to rob Tunchez, and that, while Evans and Tunchez were wrestling for the gun, Miller tried to help Evans by hitting Tunchez with a stick. See *Garay v. State*, 314 Ga. 16, 20 (2022) (holding that the State had presented direct evidence of the defendant's guilt because a trial witness "testified that [the defendant] confessed that he went to rob the man … [,] but that it went wrong and he ended up shooting the man" (quotation marks omitted)).

Direct evidence also showed that Miller "[i]ntentionally advise[d]" and "encourage[d]" Arrington's armed robbery, and thus that he was a party to the crimes against Arrington. OCGA § 16-2-20(b)(4). Specifically, Adams testified that, on the day Arrington was robbed, Miller (who was a higher-ranking gang member) told Evans

22

and Davila (lower-ranking gang members) to "put in work" for the gang, meaning to commit a robbery. This eyewitness testimony from someone who personally heard Miller recruit individuals to commit the crime was direct evidence of Miller's participation in the crime. Cf. *Harper v. State*, 298 Ga. 158, 161 (2015) (holding that "[a trial witness's] testimony regarding [the defendant's] recruitment of him to be the active perpetrator of the armed robbery" is an "example[ ] of direct, not circumstantial, evidence of [the defendant's] guilt"). And the trial evidence showed that, soon after Miller told Evans and Davila to commit a robbery, a group that included Evans and Davila robbed Arrington at gunpoint.

Because the trial evidence included direct evidence that Miller was guilty of the crimes against Tunchez and Arrington, OCGA § 24-14-6 does not apply here. See *Troutman*, 320 Ga. at 492.

3. Evans and Miller argue that their respective trial attorneys were constitutionally ineffective in multiple respects. To prevail on an ineffective-assistance-of-counsel claim, a defendant must show deficient performance and prejudice. See *Monroe v. State*, 315 Ga.

23

767, 781 (2023) (citing *Strickland v. Washington*, 466 US 668, 687 (1984)). "Establishing deficient performance requires a defendant to demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Washington v. State*, 320 Ga. 839, 851 (2025) (quotation marks omitted). "There is a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." Id. (quotation marks omitted). "Overcoming that presumption requires an appellant to show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." Id. (quotation marks omitted). "To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." Id. (quotation marks omitted). And "[i]f the defendant fails to establish either deficient performance or prejudice, this Court need not examine the other requirement." Id.

(a) On appeal, Evans and Miller argue that their respective

trial attorneys were ineffective for failing to move to suppress incriminating evidence obtained pursuant to search warrants that Evans and Miller argue were insufficiently particularized or not supported by probable cause.

"A warrant to carry out a search under the Fourth Amendment [to the United States Constitution] is properly issued if it (1) is supported by probable cause and (2) particularly describes the place to be searched, and the persons or things to be seized." *Jones v. State*, 321 Ga. 137, 141 (2025) (cleaned up). Probable cause exists to issue a search warrant if, "given all the circumstances set forth in the affidavit … , including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Britton*, 316 Ga. 283, 286 (2023) (quotation marks omitted). In applying "this commonsense standard," a magistrate "not only takes into account all of the evidence, but also may draw reasonable inferences from the information in the warrant affidavit, consider the factual and practical considerations of everyday life,

25

and depend on common-sense conclusions about human behavior." *Jones*, 321 Ga. at 142 (cleaned up). "[S]ubstantial deference must be accorded a magistrate's decision to issue a search warrant based on a finding of probable cause," and "we review the grant of a search warrant by considering the totality of the circumstances to determine if the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant." *Britton*, 316 Ga. at 287 (quotation marks omitted). "The particularity requirement," which ensures that officers have "enough guidance to locate and seize only those items the warrant authorizes," is generally satisfied if the description in the warrant "is as specific as the circumstances and nature of activity under investigation permit." *Jones*, 321 Ga. at 147–48 (quotation marks omitted).

i. Evans argues that his trial counsel was deficient for failing to move to suppress evidence obtained pursuant to a search warrant for his cell phone because that search warrant was neither sufficiently particularized nor supported by probable cause. The State concedes that the search warrant, which authorized the

seizure of all data on the phone, did not comply with the Fourth Amendment's particularity requirement. See *State v. Wilson*, 315 Ga. 613, 615 (2023) (holding that a search warrant was insufficiently particularized where "the search warrant broadly authorizes the seizure of 'any and all stored electronic information' on the phones, 'including but not limited to' various kinds of electronic information"). But the State contends that Evans has failed to show prejudice, and we agree.

Assuming without deciding that trial counsel was deficient for failing to move to suppress evidence obtained from Evans's cell phone, Evans has not established the required prejudice because the other evidence admitted at trial strongly supported the jury's determination that he was guilty of murder, armed robbery, and violations of the Gang Act.

First, there was overwhelming evidence that Evans murdered Tunchez while committing an armed robbery that he helped plan and execute. Tunchez's social media messages showed that, on the day he died, he negotiated with Torres to have sex with her and her

27

friend for $300. Beck and Adams were both aware of those communications. Adams heard Evans, who was dating Torres at the time, propose that Torres demand money from Tunchez for sex, and Beck heard Torres propose that they rob Tunchez instead. Adams then gave his gun to Evans to commit the robbery. And both Beck and Adams testified that Evans, Miller, and Torres left Evans's house before the shooting occurred. Neighborhood residents saw three people matching the descriptions of Evans, Miller, and Torres standing near the pathway before the shooting, and one resident identified Evans as a person he knew from the neighborhood. Beck and Adams testified that, after they heard a gunshot, Evans, Miller, and Torres returned to Evans's house, and that, when they arrived, Evans had the fanny pack containing the gun. According to Adams, both Evans and Miller told him what had happened, including that Evans shot the victim. And Grant testified that Evans, Miller, and Torres collectively told him about the plan to rob Tunchez by leading him to believe that he could pay Torres for sex and about Evans shooting Tunchez during a struggle for the gun. Further, Evans's

28

handwritten rap lyrics found in his bedroom after the homicide—which stated that he "like[d] to shoot" people and that "[h]ollow tips [had] rip[ped] through his neck"—both expressed a general desire to kill and appeared to describe how he had killed Tunchez.

Substantial evidence also supported Evans's convictions for committing the three armed robberies. Adams testified as a general matter that, over the weekend when the charged armed robberies and murder occurred, he gave his gun to Evans to commit several robberies, and Evans returned with stolen items. The victims of the first two robberies, who were robbed at the same apartment complex within walking distance of Evans's home, identified Torres (who Evans was with over the weekend) as one of the perpetrators and described another perpetrator as a teenage Hispanic male matching Evans's general description. According to Grant, Evans also admitted that he had committed robberies at an apartment complex within walking distance of Evans's home. And items stolen during the first two robberies were later discovered in Evans's bedroom. Further, Grant testified about his own participation with Evans in

29

the third armed robbery, and Evans could be seen in surveillance video partially capturing that crime.

Finally, the trial evidence strongly supported the jury's finding that Evans committed several Gang Act violations. Multiple witnesses testified that Evans and Miller were members of the Gangster Disciples gang, which, according to the State's gang expert had thousands of members in Georgia and many members in Gwinnett County, in particular. Adams and Grant testified that Evans participated in "jumping in" new gang members during the weekend of the murder. Adams and Grant further testified that Miller was a higher-ranking gang member, and Adams heard Miller telling other gang members, including Evans, to "put in work" that weekend, meaning to commit robberies to produce money and status for the gang. As described above, the trial evidence showed that Evans committed several armed robberies before killing Tunchez during a robbery. And officers later found items stolen from the victims at both Evans's house and Miller's residence, indicating that the proceeds from the robberies were divided between the gang

30

members.

Although Evans argues that the evidence obtained from his cell phone caused him prejudice for three reasons, he has failed to show a reasonable probability of a different result if that evidence had been suppressed. First, Evans contends that "[t]he only evidence that [he] was in a gang came from his phone (photos, texts, and videos) and from otherwise uncorroborated accomplices." But Evans is incorrect that uncorroborated accomplice testimony was the only other evidence showing that he was in a gang. As outlined above, Evans's accomplices (Adams and Grant), as well as a non-accomplice (Beck), corroborated each other in testifying that Evans was a gang member. And that testimony strongly supported a finding that Evans was a member of a gang.

Second, Evans suggests that "[a] text message [from his phone] referencing Torres obtaining a $1700 watch for him" was important "evidence tying him to the robberies." But as Evans appropriately acknowledges, "the stolen property found in his room" (which included Wei's Movado watch worth over $1,000, Russell's iPhone,

31

and Russell's custom baseball hat), as well as "Grant's testimony" about robbing Arrington, also tied Evans to the robberies. And Adams's testimony identifying Evans as one of the perpetrators captured on surveillance footage of Arrington's robberly likewise showed that Evans was involved in that crime. Thus, Evans has not shown that the text message from his phone played any significant role in proving his involvement in the robberies.

Third, Evans suggests that "evidence from the … phone" was necessary to "corroborate [testimony from] Grant." Evans does not clearly identify what evidence from his phone he believes corroborated Grant's testimony. And in any event, he has not shown that any evidence obtained from his cell phone served an important role in corroborating Grant's testimony. This is because Grant's testimony was corroborated by the surveillance video capturing parts of Arrington's robbery, by Adams's testimony identifying Evans and the other participants captured on the surveillance video, and by Arrington's testimony, which agreed with Grant's testimony in many particulars.

Because the trial evidence strongly supported Evans's guilty verdicts, and because Evans has not established that evidence obtained from his cell phone played any significant role in producing the jury's verdict, Evans has not shown a reasonable probability that the result of his trial would have been different if trial counsel had filed a successful motion to suppress the evidence obtained from his cell phone. See *Keller v. State*, 308 Ga. 492, 499 (2020) (holding that, even assuming that the trial court would have granted a motion to suppress evidence obtained from the defendant's cell phone if counsel had filed it, the defendant could not show a reasonable probability of a different outcome because "[t]he other evidence against [the defendant] was very strong").

ii. Evans and Miller argue that their trial attorneys were deficient for failing to move to suppress evidence obtained from their respective residences pursuant to search warrants. The search warrants for Evans's and Miller's residences were supported by the same affidavit. And Evans and Miller both argue that the affidavit failed to establish probable cause to search the residences listed in

33

the affidavit for Evans and Miller. As explained below, these claims fail because motions to suppress would have been denied.

According to the affidavit, officers had previously responded to a report of a fight involving Evans, Miller, and James Johnson, at which time Evans had given officers his home address, and officers had determined that Johnson was an associate of Evans and Miller. The affidavit also stated that officers had previously arrested Miller in October 2017 and on another occasion; that on both occasions Miller had listed the same home address; and that the affiant had personally "been to [Miller's] address and observed him there at the premise on a previous occasion."

The affidavit explained that, between October 5 and 7, 2018, a series of armed robberies (the robberies of Wei and Yeon, Russell, and Arrington) had occurred "within a short walking distance" from Evans's home. The affidavit recounted the robbery victims' descriptions of the suspects, how the robberies unfolded, and what was taken from them. And it stated that Wei, Yeon, and Russell each identified Torres in photo lineups as one of the perpetrators.

The affidavit further stated that Johnson said he had known Evans and Miller for years, that Johnson had "agreed to provide reliable information so that he could be eligible for a Crimestoppers Reward," and that Johnson was able to provide directions to Evans's house and point it out on a map. According to the affidavit, Johnson said that Evans's and Miller's "hobbies were to lure victims in and then rob them of whatever the victims had," including "money or drugs," and that they bragged about their robberies by posting pictures of the items they had stolen on social media. The affiant said that:

> Based upon the training, knowledge[,] and experience of your affiant, he knows that criminals use their cellular phone to communicate with other suspects, post pictures on social media, and take pictures of items taken during the commission of a crime, [and] use smart phone applications to sell or distribute proceeds from thefts.

And the affidavit stated that officers confirmed that Evans and Miller had posted pictures of themselves "holding guns, marijuana blunts, and money" on their social media accounts.

According to the affidavit, Johnson also told officers that Miller

35

had confided in him about Tunchez's death, saying that Evans, Miller, and Torres had set up a robbery, that Tunchez was supposed to pay Torres $300 to meet up with him, and that Evans had pulled the trigger and killed Tunchez. In addition, the affidavit recounted that, from the investigation of Tunchez's homicide, officers had determined that "Tunchez was known to meet females and pay for sex."

The affidavit further stated that Johnson had identified Evans, Miller, Torres, and Davila as the suspects shown in security footage capturing Arrington's robbery.[8] And the affiant stated that he had observed Evans and Torres in person, following their arrests, and that they appeared to be the people captured in the security footage.

Finally, the affiant stated:

> Based upon the short period of time between the three robberies and the direct involvement of [Evans, Miller, and Torres], your affiant believes that all three residences of the suspects may contain evidence of the victims' property and the gun(s) used to commit the crimes.

---

[8] The trial testimony described above indicated that it was Grant, not Miller, who was present for Arrington's robbery.

And the affidavit enumerated the items for which officers would search, including pistols, pistol ammunition, the suspects' cell phones, the specific items stolen from the victims, and specific items of clothing that the suspects had worn during the robberies.

(A) On appeal, Evans argues that his trial counsel was ineffective for failing to move to suppress the evidence found at his house because, although the warrant affidavit provided probable cause that crimes had occurred, the affidavit did not show that Johnson was reliable or contain probable cause that incriminating evidence would be found at Evans's house.

This claim fails because the warrant application supplied ample probable cause that incriminating evidence would be found at Evans's house, and thus a motion to suppress would have been denied. See *Evans v. State*, 308 Ga. 582, 589 (2020) (holding that a defendant could not establish deficient performance based on a failure to move to suppress evidence because "a motion to suppress the evidence would have been meritless"). As an initial matter, contrary to Evans's argument, the warrant affidavit sufficiently

37

established Johnson's reliability and basis of knowledge. As set out in the affidavit, Johnson said that he had known Evans and Miller for years, and officers knew that Johnson was in fact an associate of Evans and Miller because they had encountered Johnson, Evans, and Miller together when responding to a prior report of criminal activity. Johnson's ability to give officers directions to Evans's house and to point it out on a map further demonstrated Johnson's association with Evans.

The affidavit also established that Johnson had a financial incentive to provide truthful information because he wanted to earn a "Crimestoppers" reward. And officers' ability to verify several pieces of information that Johnson provided established his reliability as a witness. Specifically, photos that officers found on Evans's and Miller's social media accounts, which showed Evans and Miller holding guns, drugs, and money, gave credence to Johnson's statements that Evans and Miller stole drugs and money from people and bragged about the robberies they had committed by

posting photos of the proceeds on social media.[9] And the fact that investigators had independently determined that Tunchez was known to "meet females and pay for sex" made Johnson's story about Tunchez bringing a substantial sum of money to meet up with Torres credible.

Finally, Johnson's detailed description of how Tunchez's killing occurred—including the fact that Tunchez was going to bring a specific amount of money ($300) and that Tunchez was shot during a robbery—supported an inference that Johnson had obtained his information in a reliable way. See *Bryant v. State*, 288 Ga. 876, 893–94 (2011) (holding that an "informant's basis of knowledge and reliability were sufficiently established," where, among other things, the investigator "averred that the informant had provided other information involving [the defendant's] case that he had confirmed

_____

[9] Evans also briefly asserts that his phone was not a proper target for seizure because the warrant affidavit did not contain probable cause that incriminating evidence would be found on his phone. But Evans ignores the fact that officers located independent support for Johnson's statement that Evans posted incriminating photos on his social media accounts, and that it is common knowledge, as noted in the warrant affidavit, that photos posted on social media are often taken on cell phones.

as truthful," and "the informant described [the defendant's] criminal activity in … detail," supporting a reasonable inference "that the informant had obtained his information in a reliable way").

Taken together, Johnson's statements and the other evidence recounted in the warrant affidavit provided a "substantial basis for concluding that probable cause existed" to believe that incriminating evidence would be found in Evans's house. *Britton*, 316 Ga. at 287 (quotation marks omitted). Specifically, the affidavit described in detail a series of similar armed robberies that had occurred over a short period of time within a short walk from Evans's house. And Johnson identified Evans as one of the suspects captured in surveillance footage of one of those robberies. Given the proximity of the robberies to the house, the fact that Evans was identified as one of the robbers, and the fact that neither the stolen items nor the gun used in the robberies had been recovered, there was at least a fair probability that evidence related to the crimes would be found at Evans's house. See *Glenn v. State*, 302 Ga. 276, 282 (2017) (holding that, where "several witnesses had identified [the

40

defendant] as the shooter" and "numerous items relating to the killing had not yet been recovered," "the fact that [the defendant] … lived at the address listed in the search warrant meant that there was at least a 'fair probability' that items related to the crime would be found there").

Because the warrant to search Evans's house was supported by probable cause, a motion to suppress the evidence obtained from Evans's house on that basis would have been denied. Accordingly, Evans has not shown that his trial counsel was deficient for failing to move to suppress the evidence obtained pursuant to the search warrant for his house. See *Evans*, 308 Ga. at 589.

(B) Miller argues that his trial counsel was ineffective for failing to move to suppress the evidence obtained pursuant to the search warrant for his apartment on the grounds that there was no probable cause to believe that he lived at the address listed as his residence in the affidavit. Specifically, Miller contends that, although the affidavit noted that he had listed that address as his residence a year prior, that information was "stale." This claim of

41

error fails.

"In assessing staleness as it relates to probable cause, we view the totality of the circumstances to determine whether there was a reasonable probability that the conditions referred to in the sworn testimony would continue to exist at the time of the issuance of the search warrant." *Tarvin v. State*, 277 Ga. 509, 511 (2004) (quotation marks omitted). "The ultimate criterion in determining the degree of evaporation of probable cause is not case law but reason." *Lemon v. State*, 279 Ga. 618, 622 (2005) (cleaned up). And as noted above, the probable cause standard is a "commonsense standard" that allows a magistrate to "draw reasonable inferences from the information in the warrant affidavit," to "consider the factual and practical considerations of everyday life," and to "depend on common-sense conclusions about human behavior." *Jones*, 321 Ga. at 142 (quotation marks omitted).

Here, Miller has not established deficient performance because the warrant affidavit supplied probable cause that Miller lived at the address listed in the search warrant. The warrant affidavit

42

indicated that the address of Miller's residence was confirmed on three separate occasions. Specifically, it stated that Miller had given the address listed in the warrant as his residence twice—once when he was arrested for public indecency in October 2017 (a year before the warrant was sought) and a second time when he was arrested for theft by shoplifting. And the affidavit stated that the "affiant has been to [Miller's] address and observed him there at the premise on a separate occasion," as well. Although the affidavit did not specify precisely when Miller's second arrest occurred or when the officer observed Miller at his residence, the fact that Miller's residence remained stable over some period of time gave rise to a reasonable probability that Miller lived in the same location when the search warrant issued. Cf. *State v. Luck*, 252 Ga. 347, 347 (1984) (holding that, although the warrant affidavit did not specify when four previous drug purchases had occurred at a residence, "[t]he totality of the circumstances—including the circumstance that the informants had completed several drug sales at the residence *over a period of time*—indicate the existence of reasonable probability that

43

the conditions referred to in the affidavit would continue to pertain at the time of issuance of the search warrant" (emphasis added)). Because a motion to suppress on this ground would have been denied, Miller has not established deficient performance. See *Rawls v. State*, 310 Ga. 209, 222 (2020) (holding that trial counsel was not deficient in failing to file "a motion to suppress on the ground that the search warrant was based on stale information" because such a motion "would have failed").

(b) Evans argues that his trial counsel was ineffective for failing to move to disqualify the entire District Attorney's Office based on a conflict of interest that arose when attorney Courtney Adkins, whom Evans had retained to serve as defense counsel for a portion of the pretrial proceedings, withdrew as defense counsel to join the District Attorney's Office. We conclude, however, that Evans has not shown deficient performance.

Adkins's prior representation of Evans in this case would have disqualified her from prosecuting Evans in the same matter. See Rule 1.11 (c), Ga. Rules of Prof. Conduct (providing in relevant part

44

that "a lawyer serving as a public officer or employee shall not … participate in a matter in which the lawyer participated personally and substantially while in private practice or nongovernmental employment"). But the undisputed record evidence shows that, after Adkins joined the District Attorney's Office, she played no role whatsoever in Evans's prosecution: Adkins gave uncontested testimony at the motion-for-new-trial hearing that, when she joined the District Attorney's Office, she was assigned to a separate division, screening measures were "absolutely" in place, and she "had no conversations with anyone about [Evans's case]." And the mere fact that an attorney who was disqualified from Evans's case had joined the District Attorney's Office was an insufficient basis for disqualifying the entire office from Evans's prosecution. See Rule 1.11, Comment 9, Ga. Rules of Prof. Conduct ("Paragraph (c) does not disqualify other lawyers in the entity with which the lawyer in question has become associated."). As we have explained, "when one assistant district attorney in an office is disqualified from acting, certain procedures may be employed to screen that assistant from

45

the prosecution and it is not necessary that the entire district attorney's office be disqualified from prosecuting the case." *McLaughlin v. Payne*, 295 Ga. 609, 612 n.3 (2014) (emphasis omitted) (collecting cases). That is what happened here.

Because there was no basis for disqualifying the entire District Attorney's Office, a motion to disqualify the entire office would have been denied. See *Ferguson v. State*, 294 Ga. 484, 485 (2014) (affirming the denial of a motion to disqualify a district attorney's office because "there [was] no evidence of record that [prior defense counsel] had any involvement with [the defendant's] case after being hired by the District Attorney's office, nor that the attorneys who worked on the case at the District Attorney's office ever discussed any aspect of the case with [prior defense counsel]"). And trial counsel is not deficient for failing to file a meritless motion. See *Williams v. State*, 315 Ga. 797, 806 (2023).

(c) Evans argues that his trial counsel was ineffective for failing to seek a jury instruction on voluntary manslaughter. But this claim is forfeited because he failed to timely raise it.

Evans did not raise this claim when he filed an amended motion for new trial through new counsel. And although the State "interpreted [a] line of questioning" by Evans's appellate counsel at the motion-for-new-trial hearing "as an additional argument" about "voluntary manslaughter," the record shows that Evans's appellate counsel did not expressly raise or argue a claim that trial counsel was ineffective for failing to request a voluntary manslaughter charge, despite the trial court giving counsel an opportunity to do so at the hearing. Nor did Evans's appellate counsel file a brief raising the claim after the hearing, notwithstanding the trial court's invitation to file further briefing. And the trial court's order denying Evans's motion for new trial made no reference to this ineffective-assistance-of-counsel claim. Accordingly, this claim is forfeited. See *Watkins v. State*, 320 Ga. 862, 881 (2025) (holding that an ineffective-assistance-of-counsel claim was "forfeited" because the appellant did not raise it in his amended motions for new trial, even though "he was no longer represented by trial counsel when he filed those amended motions"; because "questioning during the motion-

47

for-new-trial hearing, by itself, is insufficient to amend a motion for new trial to add a claim"; and because "the trial court did not address this alleged claim in its order denying [his] motion for new trial" (quotation marks omitted)).

(d) Miller argues that his trial counsel was ineffective for failing to object to testimony from the State's gang expert that addressed the legal requirements for finding a violation of the Gang Act. In particular, Miller claims that trial counsel should have objected to the gang expert's testimony about the "gang triangle" because, according to Miller, that testimony omitted the nexus requirement for a Gang Act violation.[10] And he also asserts that trial counsel should have objected to the gang expert's general description of the Gang Act's requirements. As explained below, we conclude that Miller has not shown deficient performance.

By way of background, at trial, the prosecutor asked the State's

---

[10] See *Monroe*, 315 Ga. at 768 (explaining that, to establish a Gang Act violation, the State must prove that there was a "nexus between the [criminal] act [committed by the defendant] and the intent to further street gang activity").

48

gang expert several questions about the legal requirements for a Gang Act violation. In response, the gang expert gave testimony that included the following statements: a "criminal street gang" is "[t]hree or more individuals who associate in fact, whether formally or informally, who participate in criminal street gang activity";[11] "[c]riminal street gang activity is defined as the commission[,] attempted commission, coercion, intimidation of any person to commit a large series of offenses that include, like, armed robbery, murder, rape, entering autos, some of the larger offenses";[12] and the Gang Act explains that the State can prove that three or more individuals are associated in fact through evidence of a common name or common identifying signs, symbols, tattoos, graffiti, attire, or other distinguishing characteristics, such as common activities,

---

[11] See OCGA § 16-15-3(3) ("'Criminal street gang' means any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity as defined in paragraph (1) of this Code section.").

[12] See OCGA § 16-15-3(1)(C), (J) ("'Criminal gang activity' means the commission, attempted commission, conspiracy to commit, or the solicitation, coercion, or intimidation of another person to commit" certain enumerated offenses, including "[a]ny criminal offense … that involves violence, possession of a weapon, or use of a weapon" and "rape.").

customs, or behaviors.[13]

When asked if "there has to be a nexus between the crime and the gang," the gang expert responded, "That is correct." The prosecutor then introduced into evidence a demonstrative exhibit, which showed a "gang triangle" with the words "The Gang," "Defendant," and "The Crime" printed at the three points. The gang expert testified that a gang charge fails if any "one component of this gang triangle" is missing, and that "[t]he gang triangle explains the nexus" component, "outlin[ing] how the criminal act committed by the gang member therefore, in turn, furthers or enhances the gang" and "enhances his gang status." Later, the gang expert separately testified that robberies benefitted the Gangster Disciples because newer members were able to put in work to show that they were valuable assets to the gang, and because the members were able to divide the proceeds.

---

[13] See OCGA § 16-15-3(3) ("The existence of such organization, association, or group of individuals associated in fact may be established by evidence of a common name or common identifying signs, symbols, tattoos, graffiti, or attire or other distinguishing characteristics, including, but not limited to, common activities, customs, or behaviors.").

Here, Miller has not established deficient performance. As an initial matter, Miller has not shown that his trial counsel was deficient for failing to object to the gang expert's "gang triangle" testimony. That testimony, which explained to the jury that gang members enhance their own status and the status of their gang by committing criminal acts, was cumulative of Adams's earlier testimony that gang members "put in work" for the gang by committing crimes like robbery to earn status for the perpetrator and for the gang. See *Pierce v. State*, 319 Ga. 846, 867 (2024) (holding that "trial counsel was not deficient for failing to object to … testimony because it was cumulative of earlier unchallenged testimony"). And even assuming that Miller is correct that the "gang triangle" testimony "omitted the nexus requirement" (as opposed to explaining why there was a nexus between the gang and the criminal conduct in this case), a reasonable attorney under the circumstances could have concluded that an objection was unnecessary because the court would correctly instruct the jury on the nexus requirement and on the jury's duty to follow the law

51

provided by the court, negating any potential harm.[14] Cf. *Wynn v. State*, 313 Ga. 827, 838 (2022) ("While the court did not expressly tell the jury to disregard [a detective's] legal definitions, the court's instructions"—namely, the charge that "the court … was responsible for instructing the jury on the law" together with the charge explaining the substantive requirements of the law—"amounted to such a charge"); *Lee v. State*, 306 Ga. 663, 666 (2019) (holding that any harm caused by a witness testifying inaccurately about the law "was cured … by the trial court correctly charging the jury on [the law]" and by the court's instruction "that *the court* had the duty and responsibility to determine the law that applie[d] to th[e] case" (quotation marks omitted)).

Miller has also failed to show that trial counsel acted in an objectively unreasonable way by forgoing an objection to the gang expert's other testimony describing the Gang Act's requirements,

---

[14] In this case, the trial court ultimately instructed the jury that it was the court's duty to determine the applicable law, that the jury was bound by the court's instructions on the law, and that the State was required to prove "that there is a nexus between the crime committed and the gang, and that the crime was committed to further the interests of the gang."

which generally tracked the language of the statute, as well as the pattern charge ultimately given by the court. Trial counsel testified at the motion-for-new-trial hearing that he chose not to object to the gang expert's description of the Gang Act because the testimony had no impact on the theory of the defense (that Miller was not involved in any of the armed robberies or the murder). And Miller makes no effort to explain on appeal why the choice not to object was an unreasonable trial strategy. See *Pritchett v. State*, 314 Ga. 767, 783 (2022) (holding that trial counsel's failure to object to testimony that was neither "inconsistent with, [n]or undercut, the defense's strategy at trial" was not deficient performance). See also *Najarro v. State*, 319 Ga. 868, 870–73 (2024) (holding that trial counsel made a reasonable strategic decision in not raising objections to evidence that "d[id] not speak directly to his client's guilt or innocence"). Accordingly, this claim fails.

(e) Miller argues that his trial counsel was ineffective for failing to object to three of the prosecutor's comments during closing arguments. As explained below, however, we conclude that Miller

has not shown deficient performance.

i. First, Miller argues that his trial counsel was deficient for failing to object to the following statement by the prosecutor during closing arguments:

> [T]here is an elephant in the room I have to face. You're going to likely look at the indictment, and I'm guessing one of you is going to catch that Khalil Miller is not charged in robbery one [the robbery of Yeon and Wei]. Someone is going to say, ["W]hy[?] [H]e's the shot caller.["] Well, here's my answer[:] I don't know. And this is why I don't know. I did not draft the actual indictment in this case. When you are working in a DA's office, you don't always get to indict your own cases. Sometimes you get one that someone else indicted. In fact, I didn't even work at this office when this case was indicted. I don't know why it's not charged.

According to Miller, this statement was improper because the prosecutor "argued with facts not in evidence as to the reason [Miller] was not charged."

Here, Miller has not shown deficient performance. Miller does not argue that it was improper for the prosecutor to note that Miller was not charged in some of the counts in the indictment. And although the prosecutor referenced some facts about the charging

54

decisions that were not in evidence, it is unclear how Miller could have benefitted from an objection to the prosecutor's remarks. The gist of the prosecutor's remarks was that the rationale for the charging decisions was unknown, and an objection that the prosecutor was making the argument based on facts not in evidence could have simply highlighted that point—that the jurors could not know why the State decided to charge Miller in some counts and not others. See *Holmes v. State*, 273 Ga. 644, 648 (2001) (holding that trial counsel was not deficient for failing to object to the prosecutor's closing argument because "an objection may simply have highlighted the point being made by the prosecution" (cleaned up)). Because a reasonable attorney could have concluded that little would be gained by objecting to the prosecutor's remarks about charging decisions, Miller has not shown deficient performance. See *Powell v. State*, 291 Ga. 743, 746–48 (2012) (holding that trial counsel was not deficient in failing to object to the prosecutor's "highly improper" remarks about the decision to charge the defendant because, under the circumstances, "a defense lawyer

might reasonably conclude that little would be gained by an objection"). Cf. *Walker v. State*, 308 Ga. 749, 760 (2020) (holding that "it would have been objectively reasonable for counsel to decide not to object" to certain testimony, "[g]iven the lack of a clear benefit to the defense from even a successful objection"), disapproved of on other grounds by *Johnson v. State*, 315 Ga. 876 (2023).

ii. Second, Miller contends that his trial counsel was ineffective for failing to object to an improper "golden rule" argument made by the prosecutor in closing arguments. See *Lord v. State*, 304 Ga. 532, 541 (2018) (explaining that "a 'golden rule' argument" is one that "ask[s] the jurors to place themselves in a victim's position" (quotation marks omitted)). Specifically, he claims that trial counsel should have objected when the prosecutor said the following:

> The State must prove that the defendant attempted to cause a violent injury or committed an act that placed that person in reasonable apprehension or fear of immanently [sic] receiving a bodily injury. The armed robberies, it was stated that the guns were pulled, the guns were pointed. This is for each armed robbery. You heard the testimony of [the four victims] … . All four of them said the gun was pointed, they were scared, they felt violated. *I submit to you that if you had a gun pointed at*

56

*you, you would be placed in reasonable apprehension, fear*
*of an immanent [sic] injury.*

(Emphasis added).

Assuming without deciding that the prosecutor's brief remark—that "if you had a gun pointed at you, you would be placed in reasonable apprehension, fear of an immanent [sic] injury"—constituted an improper "golden rule" argument, a reasonable attorney could have concluded that an objection to it was unnecessary because it had no impact on the theory of the defense. As noted above, Miller's theory of the defense was not that the crimes had not occurred but instead that he did not participate in them. Accordingly, Miller has not shown deficient performance. Cf. *Pritchett*, 314 Ga. at 783 (2022) (holding that it was not deficient performance to forgo an objection to testimony that did not conflict with or undercut the theory of the defense).

iii. Finally, Miller argues that his trial counsel was deficient for failing to object to a biblical reference made by the prosecutor in closing arguments. The record shows that, in rebuttal closing, the

prosecutor argued that Miller and Torres were parties to the crime when "[Evans] decided to pull that trigger" and shoot Tunchez. The prosecutor then quoted a verse from the Bible, saying:

> So how do we know what was going through [Evans's] head? There's a verse in the book of Matthew that says this: What comes out of the mouth proceeds from the heart. What comes out of the mouth proceeds from the heart. What we say, what we write, and what we sing.

The prosecutor proceeded to reference several of Evans's rap lyrics, including lines in which Evans had said, "Pulling up with guns, we do this s**t for fun. Hitten [sic] licks and taken s**t. Hollow tips rip right through your neck." And the prosecutor argued that "Tunchez is dead. Nicholas Evans had shot him in the neck and then he was bragging about it."[15]

Here, Miller has not shown that trial counsel was deficient for failing to object to the prosecutor's quotation from the Bible. Miller does not clearly explain why he believes the prosecutor's biblical

---

[15] Although the prosecutor cited lyrics found on Evans's cell phone in closing arguments, Evans's handwritten lyrics found in his bedroom contained similar lines about committing armed robberies with guns ("[h]ittin licks and taking sticks"), shooting people ("we like to shoot big b's," and "Ima shoot you"), and shooting Tunchez ("[h]ollow tips rip through his neck").

reference was objectionable. But relying on a concurring opinion from the Court of Appeals, he suggests that the prosecutor's reference to a Bible verse was improper because it invited the jury to convict Miller based on a "higher moral authority," rather than based on the applicable law. See *Cole v. State*, 261 Ga. App. 809, 813 (2003) (Ruffin, P.J., concurring and concurring specially) ("The Supreme Court of Georgia has noted, particularly in death penalty cases, that prosecutors should avoid references to religion which invite jurors to base their verdict on extraneous matters not in evidence. The Court has been especially troubled by instances where the prosecutor has directly quoted the Bible and has found that such references invoked a higher moral authority and diverted the jury from the discretion provided to them under state law." (cleaned up)).

It can sometimes be "difficult to draw a precise line between religious arguments that are acceptable and those that are objectionable." *Carruthers v. State*, 272 Ga. 306, 310 (2000), overruled on other grounds by *Vergara v. State*, 283 Ga. 175 (2008). But "we have long declined to disapprove of passing, oratorical

references to religious texts in arguments by counsel, and have distinguished those fleeting references from more direct references that urge that the teachings of a particular religion command a certain verdict." *King v. State*, 282 Ga. 505, 508 (2007) (cleaned up).

Here, the prosecutor's reference to a biblical verse fell on the permissible side of the line between proper and improper references to religious texts. This is not a case in which the prosecutor quoted a religious text to argue that a "higher moral authority" required the jury to return a specific verdict. Compare *Carruthers*, 272 Ga. at 310 (holding that "the assistant district attorney in this case overstepped the line in directly quoting religious authority as mandating a death sentence"). Instead, the prosecutor in this case quoted the Bible only for the proposition that our words ("[w]hat we say, what we write, and what we sing") can provide insight into what we are thinking (what is "going through [our] head[s]").

Because the prosecutor's brief reference to the biblical verse was not obviously improper, Miller has not shown that trial counsel performed deficiently by failing to object to it. See *King*, 282 Ga. at

60

508 (holding that, because the prosecutor's closing argument that incorporated a "fleeting" biblical reference fell within "the parameters of acceptable argument," trial counsel was not deficient for failing to object when the prosecutor argued, "A long time ago, it was said 'who so shall offend one of these little ones, better for him that a millstone were hanging about his neck.' The man that harmed that little one is in this courtroom. And the evidence is absolutely unrefutable. We ask you to fulfill your oath and to hang that millstone around his neck and find him guilty on all counts." (punctuation omitted)).

4. Miller argues that the trial court committed several merger-related sentencing errors, and the State argues that the trial court committed a different merger error. As relevant here, the trial court merged for sentencing purposes Count 5 (which charged Miller with the aggravated assault of Tunchez with a deadly weapon) with Count 4 (which charged Miller with the armed robbery of Tunchez); but the court did not merge Count 17 (which charged Miller with the aggravated assault with Arrington with a deadly weapon) with

61

Count 16 (which charged Miller with the armed robbery of Arrington). The trial court imposed separate sentences for the Gang Act charges in Counts 6 and 7, which charged Miller with violating subsections (a) and (d) of OCGA § 16-15-4, respectively, by committing the armed robbery of Tunchez.[16] And the trial court merged for sentencing purposes Count 18 (which charged Miller with a violation of the Gang Act predicated on the armed robbery of Arrington) with Count 16 (which charged Miller with the armed robbery of Arrington). As explained below, we vacate Miller's sentence as to Count 17 but affirm his sentence in all other respects.

(a) On appeal, Miller raises two arguments regarding merger

---

[16] Count 6 alleged that Miller, "being associated with a criminal street gang, … did unlawfully participate in criminal gang activity through the commission of the offense of Armed Robbery." See OCGA § 16-15-4(a) ("It shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3."). And Count 7 alleged that, while "being in a position of leadership in a criminal street gang," Miller "did engage in criminal gang activity by participating in the criminal offense of Armed Robbery." See OCGA § 16-15-4(d) ("It shall be unlawful for any person who occupies a position of organizer, supervisory position, or any other position of management or leadership with regard to a criminal street gang to engage in, directly or indirectly, or conspire to engage in criminal gang activity.").

of the aggravated assault counts. Miller first contends that the trial court should have "vacated" Count 5 (aggravated assault with a deadly weapon of Tunchez), rather than merging it for sentencing purposes with Count 4 (armed robbery of Tunchez), because Count 5 involved the same facts used to prove Count 1 (malice murder of Tunchez). And second, Miller contends—and the State concedes—that Count 17 (aggravated assault of Arrington) should have merged with Count 16 (armed robbery of Arrington). As explained below, Miller is partially correct.

We have held that, "because there is no element of aggravated assault with a deadly weapon that is not contained in armed robbery, that form of aggravated assault will merge into armed robbery if the crimes are part of the same act or transaction." *Chambers v. Hall*, 305 Ga. 363, 365 (2019) (quotation marks omitted). We have also held that aggravated assault merges with malice murder if the crimes were committed as part of the same act or transaction. See *Lynn v. State*, 310 Ga. 608, 611 (2020). And where the same act or transaction underlies separate charges of

aggravated assault, armed robbery, and malice murder, a court has discretion to merge the aggravated assault charge with either armed robbery or malice murder. Cf. *McIver v. State*, 321 Ga. 565, 576 (2025) (holding that, because this Court was reversing the defendant's conviction for armed robbery, the trial court could no longer merge an aggravated assault count with the armed robbery count and was instead required to merge the aggravated assault count with a malice murder count based on the same act or transaction).

Here, Miller has not shown any error with respect to Count 5. Because the same act (pointing a gun at Tunchez when robbing him) served as the basis for both the charged aggravated assault of Tunchez and the charged armed robbery of Tunchez, the trial court properly merged Count 5 (aggravated assault) with Count 4 (armed robbery) for sentencing purposes, even though the court could have instead chosen to merge Count 5 with Count 1 (malice murder). See *Chambers*, 305 Ga. at 365.

But we agree with Miller and the State that the trial court

erred in imposing a sentence for Count 17 (aggravated assault). That count merged with Count 16 (armed robbery) because both charges were based on the same act (pointing a gun at Arrington when robbing him). See *Chambers*, 305 Ga. at 365. Accordingly, we vacate Miller's sentence on Count 17.

(b) Miller also argues that the trial court erred in imposing separate sentences for Counts 6 and 7, which charged Gang Act violations under OCGA § 16-15-4(a) and OCGA § 16-15-4(d), respectively. According to Miller, because both counts were predicated on the same offense (the armed robbery of Arrington), they should have merged for sentencing purposes. As explained below, we disagree.

OCGA § 16-15-4(m) provides that "[a]ny crime committed in violation of this Code section shall be considered a separate offense." In *Monroe*, we held that, "[b]ecause the plain language of OCGA § 16-15-4(m) indicates the legislature's intent to punish as 'separate offense[s]' violations of subsections (a) and (b), charged violations of those subsections cannot merge." *Monroe*, 315 Ga. at 787. As we

explained,

> The plain language of [OCGA § 16-15-4(m)] evidences the legislature's clear intent to designate certain crimes as "separate offense[s]" subject to separate punishments. Those crimes that constitute separate offenses under subsection (m) are specifically "crime[s] committed in violation of *this Code section*." Subsection (m) appears within "Code section" 16-15-4. Thus, subsection (m) indicates that the crimes which should be treated as "separate offense[s]" are those violations of law defined in OCGA § 16-15-4, including, as relevant here, violations of subsections (a) and (b), each of which specifies that "[i]t shall be unlawful" for a person to engage in certain conduct.

Id. at 786–87 (citations omitted).

Although *Monroe* did not expressly consider whether charged violations of subsections (a) and (d) of OCGA § 16-15-4 merge, our rationale for concluding that violations of subsections (a) and (b) cannot merge applies equally to subsections (a) and (d). Under subsection (m), "the crimes which should be treated as 'separate offense[s]' are those violations of law defined in OCGA § 16-15-4"— including, as relevant here, violations of subsections (a) and (d)— "each of which specifies that '[i]t shall be unlawful' for a person to engage in certain conduct." *Monroe*, 315 Ga. at 787. See OCGA § 16-

15-4(a) & (d). And because the plain language of OCGA § 16-15-4(m) indicates that the legislature intended to punish violations of subsection (a) and (d) as "separate offense[s]," charged violations of those subsections cannot merge. OCGA § 16-15-4(m). See *Monroe*, 315 Ga. at 786–87. Accordingly, the trial court properly declined to merge Counts 6 and 7 for sentencing purposes.

(c) Finally, the State argues in its principal brief that the trial court erred in merging Count 18 (which charged Miller with a Gang Act violation predicated on the armed robbery of Arrington) with Count 16 (which charged Miller with the armed robbery of Arrington), and that we should therefore remand the case for the trial court to impose sentence on Count 18. But we decline to consider the trial court's merger of Count 18 with Count 16, which benefitted Miller, because the State "failed to file a cross-appeal and has failed to identify on appeal any exceptional circumstances requiring us to correct any error[ ]." *Dresbach v. State*, 308 Ga. 423, 423 n.1 (2020) (citing *Dixon v. State*, 302 Ga. 691, 698 (2017)).

* * *

67

For the reasons stated above, we affirm the convictions and sentences of Evans and Miller, with the exception of Miller's sentence on Count 17, which we vacate.[17]

*Judgment in Case No. S25A0762 affirmed. Judgment in Case No. S25A0763 affirmed in part and vacated in part. All the Justices concur.*

---

[17] We need not remand the case for resentencing "because there are no counts for which the trial court c[ould] enter a sentence on remand." *Booth v. State*, 301 Ga. 678, 688 (2017). See *Sillah v. State*, 315 Ga. 741, 757 & n.4 (2023) (vacating sentences on counts that should have merged but noting that a remand for resentencing was unnecessary, where there were no counts on which the trial court still needed to impose sentence).

PETERSON, Chief Justice, concurring.

I join the opinion of the Court in full. I write separately to note that the well-settled standard we apply in Division (3)(b) for assessing conflicts in district attorneys' offices differs materially from the standards we have invented for public defenders' offices. Those standards for public defenders' offices have done more harm than good. We should change them.

As Division (3)(b) articulates, we do not impute conflicts from one assistant district attorney to the whole office as we do for private law firms. See also *Frazier v. State*, 257 Ga. 690, 693–95 (1987) (rejecting argument that conflicts should be imputed to an entire district attorney's office as they are in private law firms). But we *do* impute conflicts from one assistant public defender to the whole office as we do for private law firms. See *In re Formal Advisory Opinion No. 10-1*, 293 Ga. 397 (2013) (*In re FAO 10-1*) (holding that Georgia Rule of Professional Conduct 1.10(a) generally prohibits lawyers within the same public defender's office from representing multiple defendants in the same case). I am skeptical that *In re FAO*

*10-1* was decided correctly. But even if it was, it has caused serious problems for the criminal justice system in Georgia, especially in large cases with many co-defendants. And in conjunction with an overreading of our decision in *Garland v. State*, 283 Ga. 201 (2008), *In re FAO 10-1* has hamstrung the State by preventing it from using efficient and effective approaches to fulfilling its constitutional obligation to provide appellate representation to indigent defendants over the last decade.

Happily, we have the power to fix that. As *In re FAO 10-1* correctly observed, its conclusion was strictly a matter of interpreting Georgia Rule of Professional Conduct 1.10(a); it was not compelled by the United States Constitution. See *In re FAO 10-1*, 293 Ga. at 401 n.4; see also *Cuyler v. Sullivan*, 446 US 335, 350 (1980) ("In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."). And *In re FAO 10-1* did not foreclose us from amending Rule 1.10(a) to allow the State to employ more efficient and effective methods for protecting

70

indigent defendants' constitutional right to effective, conflict-free counsel. See *In re FAO 10-1*, 293 Ga. at 401 n.4. This Court is the only body with the power to make that change, and it is high time that we did.

I am authorized to state that Presiding Justice Warren, and Justice Bethel, Justice McMillian, Justice LaGrua, Justice Colvin, and Justice Pinson join in this concurrence.